NATIONAL BANK OF THE REPUBLIC OF NEW YORK et al. v. HOBBS et al.

(Circuit Court, S. D. Georgia, W. D.   August 10, 1901.)

1. CREDITORS' SUITS—ABATEMENT—EFFECT OF BANKRUPTCY PROCEEDINGS.
    The jurisdiction of a federal court of equity to proceed to a final decree in a pending suit by judgment creditors, commenced after the return of executions nulla bona, to set aside alleged fraudulent conveyances by the debtor, is not affected by the filing of a petition in voluntary bankruptcy by the defendant.

2. SAME—EVIDENCE—PRESUMPTION FROM FAILURE TO PRODUCE BOOKS OF BANK.
    In a creditors' suit against the members of an insolvent banking firm to set aside alleged fraudulent transfers of the bank's assets, the failure of defendants to produce the important books of the bank when required, or to account for the same, raises a presumption of fraud, of the most damaging character.

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. §§ 289, 651.

**8. FRAUDULENT CONVEYANCES—APPOINTMENT OF RECEIVER—EVIDENCE CONSIDERED.**

Evidence examined on an application by complainants in a creditors' suit for the appointment of a receiver, and *held* to strongly sustain the allegations of the bill that conveyances of large amounts of real estate by the judgment defendant, the greater part of which came into the possession of his wife and other relatives, were fraudulent, and made with intent to hinder and delay creditors, and to entitle complainants to the appointment of a receiver for such property.

In Equity. Creditors' bill. On application for appointment of permanent receiver.

Hall & Wimberly, W. W. Bacon, Jr., and D. H. Pope & Son, for complainants.

Hardeman, Davis, Turner & Jones, Guerry & Hall, and J. W. Walters, for respondents.

SPEER, District Judge. The questions for determination here have been presented in a full hearing upon an application for the appointment of a permanent receiver in the above-stated case. The case itself was originated by a creditors' bill brought by judgment creditors of Richard Hobbs and A. W. Tucker, formerly conducting a banking firm under the name of Hobbs & Tucker. The bill is intended to reach and subject to the judgment debts of the plaintiffs certain lands and other assets which it is alleged were fraudulently conveyed, and are fraudulently protected from the liens of said judgments.

It is contended by the respondents that the jurisdiction of the court to redress the injury complained of has been nullified by the bankruptcy act of 1898, and the voluntary petition in bankruptcy filed by Hobbs & Tucker. Now, it cannot be intelligently denied that the court had jurisdiction when the bill was brought. The remedy in equity sought is not only the one most usually resorted to by creditors holding executions with return of nulla bona under similar circumstances, but it constitutes the most ancient foundation of jurisdiction of equity courts. Bump, Fraud. Conv. § 532, p. 525. The return of nulla bona is conclusive of the fact that the remedy at law no longer exists. Jones v. Green, 1 Wall. 330, 17 L. Ed. 553. It is true, moreover, that if the contention of defendant's counsel that the proceeding here has abated because of the voluntary petition in bankruptcy is true, it follows that the defendant by his own act effectually precludes all relief in the courts of the United States, and the doors of these courts are effectually closed to creditors who may have occasion to apply to them to enforce judgments against fraudulent transfers by the debtor of his property. However clear the right, however glaring the fraud, it is then competent for a defendant who has made fraudulent conveyances to destroy this valuable power of a court of equity, secured to nonresidents by the constitution of the United States, by merely filing a voluntary petition in bankruptcy. If this power resides in the debtor, he can exercise it at any stage of the case; and, no matter what the court has done, or how far the cause has proceeded, the lawfully acquired jurisdiction must be relinquished, and the plaintiffs, at their own expense, denied the bene-

fit of the litigation commenced and conducted by them. A number of cases have been cited by respondents' counsel in support of this plea in abatement, but they are all cases in which the creditor held no judgment or other lien at the time the petition in bankruptcy was filed. In none of these cases had the creditor obtained a judgment against the bankrupt until after the filing of the petition, the adjudication, and discharge. On the contrary, the precise question now before the court has been definitely decided. In Kimberling v. Hartly (C. C.) 1 Fed. 571, the court held:

"Judgment, execution, and a return of nulla bona place the judgment creditor in a position to assail conveyances made by the judgment debtor to defraud his creditors; and the filing of a bill for that purpose, and the service of process in the action, create a lien in equity upon the lands described in the bill, and entitle the plaintiff to priority over other creditors. The lien thus created is not displaced by the subsequent bankruptcy of the judgment debtor, but is protected by the bankrupt act."

Again:

"Where an action is pending in a state court of competent jurisdiction to enforce a specific lien on property of the debtor, the subsequent bankruptcy of the debtor does not devest the state court of its jurisdiction to proceed to a final decree in the cause, and execute the same. The assignee in bankruptcy may intervene in such action, but the jurisdiction of the state court, and the validity of its decree, is not affected by his failure to do so."

The court continues:

"The judgment creditor filed his bill, had a subpoena served, and thereby acquired a lien, before the commencement of proceedings in bankruptcy. He did not prove his debt against the estate of the bankrupt, or in any manner voluntarily submit himself to the jurisdiction of the bankrupt court, but was allowed to proceed to enforce his lien without objection from that court or its assignee. In this state of the case, the state court had a right, and it was its duty, to proceed with the cause. Its jurisdiction was complete, and its decree and the title acquired under it are as valid and effectual as if the bankruptcy of the defendant had not intervened."

The following cases are cited, and fully sustain the ruling of the court: Sedgwick v. Menck, 6 Blatchf. 156, Fed. Cas. No. 12,616; Clark v. Rist, 3 McLean, 494, Fed. Cas. No. 2,861; In re Davis, 1 Sawy. 260, Fed. Cas. No. 3,620; Goddard v. Weaver, 6 N. B. R. 440, Fed. Cas. No. 5,495; Second Nat. Bank v. National State Bank, 10 Bush, 367; Davis v. Railroad Co., 1 Woods, 661, Fed. Cas. No. 3,648; Norton's Assignee v. Boyd, 3 How. 426, 11 L. Ed. 664; Townsend v. Leonard, 3 Dill. 370, Fed. Cas. No. 14,117; Johnson v. Bishop, 1 Woolw. 324, Fed. Cas. No. 7,373; Reed v. Bullington, 49 Miss. 223; Waller's Lessee v. Best, 3 How. 111, 11 L. Ed. 518; Marshall v. Knox, 16 Wall. 551, 21 L. Ed. 481; Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403. The jurisdiction of the court is complete.

The allegations of the bill are very comprehensive and, for the purposes of the interlocutory decree sought, may be sufficiently gathered from the discussion following.

The original complainant is the National Bank of the Republic of New York. The Chicago Packing & Provision Company of Chicago, Ill., has intervened and joined as complainant; and subsequently the Chemical National Bank of New York and Mrs. Annie E. Hamlet, a citizen of the same state, were also made parties complainant by

intervention. The judgments held by these complainants aggregate $37,966.22, principal and interest, besides costs. No question is made as to the validity or regularity of the judgments held by any of the complainants, save that of the National Bank of the Republic for $5,050 principal, and $2,668.92 interest. This judgment was rendered when the defendant Richard Hobbs, who is a member of the bar, was sole attorney for the complainant. It is now attacked as void on the ground that it was not taken in a proper way. It does not, however, appear to be invalid. It appears from the evidence that there are judgment debts held by other creditors, which, added to the claims of the complainants, principal and interest, amount to about $116,000, exclusive of costs of court. The claims held by the complainants were sued to judgment several years ago,—that of the National Bank of the Republic and the Chicago Packing & Provision Company in 1894, of the Chemical National Bank in 1896, and that held by Mrs. Annie E. Hamlet in 1897. Proceedings have been pending to enforce these claims in the courts of the state, but have been met with many causes of delay, which have obstructed the efforts of complainants, all of which have proved abortive. This is fully set out in the testimony of D. H. Pope, one of the counsel for the complainants, which will be found in the record. This proceeding was filed on the 15th day of June, 1900, and since that time Hobbs & Tucker have instituted voluntary proceedings to obtain a discharge in bankruptcy. These are now pending. Discharges have not been granted. When the bill was originally presented, Merrel P. Callaway was appointed as temporary receiver. That officer proceeded with great diligence to ascertain and locate the assets of the insolvent firm. Subsequently important amendments were filed, largely as a result of the discoveries of fact ascertained by the investigations of the receiver. It was soon developed that the defendants Hobbs & Tucker and Henry A. Tarver, cashier of the firm, had not preserved the books, from which alone it could be ascertained what were the bank's assets and liabilities, what assets were good, and whether the assets had been applied to the payment of the liabilities, or had been retained by the defendants, or either of them, or by some person acting for them. The defendant Hobbs has answered that he considered the books as worthless; and Tarver, the cashier, that he regarded them as rubbish. These books have been missing since 1896, when there was a hearing, under the orders of the state court, before A. L. Hawes, acting as auditor. A number of books were retained, and are now in the possession of the receiver, but they are largely unimportant. The important books have all disappeared, and this has greatly embarrassed the court in the effort to determine the rights of the parties. The important books which, notwithstanding a drastic rule against the defendants to secure their production, have not been obtainable, are the general ledgers of the bank, the book of bills receivable, and the general cash book. These missing books extend from the year 1888 down to the failure in 1893, and the subsequent winding up of the business. All of those mentioned have disappeared. It may be said that nothing can be more absolutely important to honest banking than the preservation of the books.

Checks of depositors are returned to them; the notes paid by debtors are likewise returned to them on payment of their debts, together with such collateral as may have been given for security; and therefore nothing remains as evidence of that trust of high order undertaken by bank officers if the books which record these transactions are willfully or negligently lost or destroyed. It follows that if the books of an insolvent bank are absent, and not accounted for, it raises a presumption of fraud of the most damaging character against those who are responsible to creditors for the assets of the bank. "Omnia præsumuntur contra spoliatorem." It has been long settled that "if a man, by his own tortious act, withhold the evidence by which the nature of his case would be manifested, every presumption to his disadvantage will be adopted." 1 Smith, Lead. Cas. p. 308. The maxim applies to the spoliation of ship's papers. The Hunter, 1 Dod. 480, 486; The Johanna Emilie, 18 Jur. 703, 705. A more pertinent citation, perhaps, is found in 3 Starkie, Ev. (3d Ed.) 937:

"Where a party has the means in his power of rebutting and explaining the evidence adduced against him, if it does not tend to the truth, the omission to do so furnishes a strong inference against him."

In Wardour v. Berisford, 1 Vern. 452, cited in Broom, Leg. Max. p. *903:

"An account of personal estate having been decreed in equity, the defendant charged the plaintiff with a debt as due to the estate. It was proved that the defendant had wrongfully opened a bundle of papers relating to the account, which had been sealed up and left in his hands. It further appeared that he had altered and displaced the papers, and that it could not be known what papers might have been abstracted. The court, upon proof of these facts, disallowed defendant's whole demand against the plaintiff, although the lord chancellor declared himself satisfied, as, indeed, the defendant swore, that all the papers intrusted to the defendant had been produced; the ground of this decision being that in odium spoliatoris omnia præsumuntur."

Thus, "if a devisee under a first will destroy a subsequent will, it will be presumed, as against him, that the first will has been revoked." Harwood v. Goodright, Cowp. 87, decision by Lord Mansfield. It is true that this presumption only arises where there is suspicion of fraud, and it is also true that, where the deficiency of evidence arises from negligence of the party who ought to have produced it, he who is accountable for that negligence cannot be benefited by it. Powell, Ev. *50. Nor can it be with justice concluded in this case that the members of the firm of Hobbs & Tucker were unaware of the importance of these books. The bank closed on June 10, 1893. The books were proven to be in existence on December 25th of the same year. The senior member of the firm, Richard Hobbs, has been for many years one of the most well known and experienced lawyers in the state; also over a large part of that time occupying judicial stations of importance. He had amassed a large fortune, and had multitudinous interests. The other member of the firm, A. W. Tucker, was an expert bookkeeper. Mr. Hobbs immediately after the failure was given possession of all the assets of the insolvent firm, all the individual property of A. W. Tucker, and was charged with the duty of winding up the affairs of the bank and of

liquidating its indebtedness. He naturally anticipated litigation, and immediately proceeded to employ counsel who shortly thereafter appeared to protect and defend the conveyances which it is alleged in the bill before the court that Mr. Hobbs made in order to defeat, hinder, and delay the creditors of the bank. How impossible, then, is it for the court to accept the statements of Hobbs and Tarver that these books were regarded as worthless and as rubbish. Had the transactions attacked by the bill and hereinafter considered been made with proper regard to the law, these books, if accurately kept, —and there is no pretense that they were kept otherwise,—would have been an absolute defense to every important charge made by the bill. It is probably true that never before did members of an insolvent banking firm more clearly understand the importance of the books to the proper and rightful adjustment of its liabilities, and perhaps never before was more distinctly illustrated the importance and necessity of that presumption against the wrongdoer, arising from the spoliation or the willful or negligent destruction of important evidence of this character. In the presence of the serious charges of fraud made by the bill, and guided by the imperative presumption created by the law under circumstances similar to those above enumerated, we must consider the immense mass of evidence offered by the parties, respectively, in order to determine the necessary issues presented by the bill, and involved in the application to make the receiver permanent.

What were the liabilities of the insolvent firm of Hobbs & Tucker on the date of the failure, namely, June 10, 1893? The answer of Richard Hobbs states the amount to be $225,000. In the absence of the books, this statement can be neither verified or disproved. Next, what were the assets? It is not disputed that these were very large, but what they consisted of, or what disposition was made of them, or what was their aggregate amount, for the same reason, cannot be precisely determined. We have the right to presume that their face value must have exceeded the liabilities, for the banking firm continued to receive deposits up to the time of the failure, and, if its assets had been less than its liabilities, it would have been so plainly insolvent that to have received deposits would have made its officers guilty of felony. Pen. Code Ga. par. 207. Laws Ga. 1878–79, p. 170. And of the felony they are presumed to be innocent. There can be no doubt that deposits were received up to the last moment. This appears from the memorandum cash books. Besides, the defendants swear that they believed their assets were largely in excess of their liabilities. In fact, in March before the failure in June, the firm of Hobbs & Tucker wrote two letters, both of which are in evidence,—one of them to Charles E. Wilson, dated March 16th, and the other to Stedman, Stern & Wheeler, Boston, Mass., dated March 15th. In both of these letters they state that they had in the business at the time $50,000, and the property owned by Richard Hobbs individually, outside of the business, on which there was no indebtedness at all, is stated to be $200,000. This evidence is clearly admissible. The defendants cannot be heard to deny its truth. Besides, the general ledger was then in existence, and on this the

assets and liabilities might be brought down and balanced. Again, A. W. Tucker, in his testimony given before the referee in bankruptcy, stated that shortly before the doors were closed the books of the bank showed a considerable balance of assets over and above liabilities, and that at the latest period before the failure, when the profits were computed and passed to investment account, the capital invested, together with the accumulated profits passed over from year to year, amounted to $44,000, and the books showed at the time gross assets of $44,000 more than all the debts, and that the books were correctly kept. Adding interest after that time which might have been charged in advance, considered at the time the letters above quoted were written, the excess of values owned by the bank above liabilities would approximate $50,000, as stated. Taking, then, the liabilities at $225,000, and adding $44,000, capital invested and accumulated profits, we find at the time of the failure the assets of the bank were $269,000. It may be observed that the solicitors for respondents have not attempted to break down the theory upon which the complainants attempt to show the amount of assets of the insolvent bank, which the court ex necessitate is compelled to adopt, but they content themselves by attacking the values of these assets. In his answer to the rule by which it was attempted to compel the production of the books of the bank, Mr. Hobbs states that the value of the assets which proved worthless amounted to $75,000. He does not specify the valueless items which made up this large statement of worthless assets. One, indeed, he did state. This was a claim against Ragan amounting to $35,000 or $40,000, which, according to the answer, resulted in a loss of $25,000 to $30,000; but it appears that the land, money, and other assets turned over by Ragan to Hobbs & Tucker were nearly or quite sufficient to pay off the entire indebtedness. Thirty-five hundred acres of land in Baker county, for a consideration of $16,500, and 2,000 acres of land in Mitchell county, for a consideration of $12,000 were conveyed to Hobbs & Tucker in settlement of this debt. These lands were conveyed by Richard Hobbs to H. H. Tarver, a hopelessly insolvent relative, who was by the conveyance created a trustee for a number of the creditors of Hobbs & Tucker; and this Tarver sold these lands to Mrs. Annie T. Hobbs, his sister, and the wife of Richard Hobbs. They were advertised and sold at public sale. Hobbs induced J. O. Perry to bid on them. Nobody knew Perry was a by-bidder. He ran the 3,300 acres up to the sum of $1,100, and Hobbs had the deed made to his wife. It may be said that, of the creditors named in the trust deed, several had been paid in full out of the assets of Hobbs & Tucker months before the deed was made, and the others, except Mrs. Hobbs, who was named as a creditor, not only never heard of the trust deed, or so-called sale under it, but never received a dollar of the proceeds. In a sense, therefore, this asset proved valueless to creditors, but its intrinsic value was, as we have seen, quite considerable. Notwithstanding the large consideration mentioned in the deed, it is a statement of value by which they would seem to be bound, for they accepted the lands at that price. It further appears that these lands were left in the hands of J. O. Perry to return them for

taxation, and they were thereafter returned as the property of Richard Hobbs. This, however, it is claimed, was done by mistake. It will be observed that the values at which they were returned for taxation were much higher than the price bid for them at the sale. It is claimed that this was done in obedience to a rule enforced by tax receivers in that county,—that all lands, regardless of their value, whether 50 cents or $10 an acre, had to be returned for taxation at $2 an acre. It is obvious that tax receivers had no power to arbitrarily fix the taxable value in this way, and certainly that one so familiar with the law as was Mr. Hobbs would not have submitted to it, had he cared to resist it. While logically we should have discussed this Ragan item in this place merely as it related to the value of the assets, with what has been said we may now pass it as an illustration of the method by which it will appear that the valuable assets of the insolvent firm, after pursuing a circuitous path, finally finds a resting place among the possessions of Mrs. Annie T. Hobbs, the wife of the senior partner.

Estimating the Ragan properties at from $25,000 to $35,000 in value, the next inquiry will be, what has become of $40,000 or $50,000 of valueless assets which the defendant Richard Hobbs tells us was the amount which proved uncollectible? The assets having been shown to exist, the court cannot accept silence as to their disposition as proof of worthlessness, especially in the absence of the books which deprive the parties of all opportunity of examining the truthfulness of that allegation. If, however, we should accept $75,000 as valueless, as stated by the defendant Hobbs, there would still remain a balance of assets of $194,000. Much is said of losses to the insolvent firm on account of what are termed "rediscounts." This expression has represented throughout the hearing transactions of the following character: Hobbs & Tucker would sell in Eastern markets the notes and obligations made to them by their immediate customers. They indorsed such evidences of indebtedness, and, of course, in case the original maker failed to pay, became liable themselves to the purchaser. The creditors who hold now rediscounts are the National Bank of the Republic, Henry Talmage & Company, the Yale National Bank, the Chemical National Bank, and the Savannah Banking & Trust Company. The aggregate amount owing to all of these creditors, except the National Bank of the Republic, is $26,651.70 principal. Of this, $1,115.96 owing the Savannah Bank & Trust Company is an open account. With regard to the claim of the National Bank of the Republic, it appears that after the failure certain lands which stood in the name of A. W. Tucker in Worth county, and one-half interest in certain lands in Decatur county owned by Hines & Hobbs, a law firm composed of R. K. Hines and the defendant Hobbs, were conveyed to the bank as a further security for the debt. These lands were sold for $2,961.81, and the amount credited on the debt, leaving a large balance due the bank. The evidences of this indebtedness on the part of the original makers and Hobbs & Tucker, guarantors, were sent by the National Bank of the Republic to Richard Hobbs, to be collected by him in the capacity of their attorney at law. The makers were principally

H. H. Tarver and the Ragans. The Tarver notes thus belonging to the National Bank of the Republic are secured by a mortgage on a large and valuable plantation. Tarver, it appears, is the brother-in-law of the attorney to whom these claims were sent for collection; and the same attorney, who in December, 1893, had been employed by Mr. Hobbs and his family and relatives, brought a bill for Mrs. E. G. Tarver, mother of Mrs. Annie T. Hobbs and of H. H. Tarver, to enjoin the foreclosure of the mortgage owned by the National Bank of the Republic, and which was the security for their debt. This bill was filed by the common attorney of his wife, Mrs. Hobbs, his mother-in-law, Mrs. E. G. Tarver, and his brother-in-law, H. H. Tarver. The bill was filed to the April term, 1897, and since that time it has been wholly impossible to bring it to trial. The Ragan transaction has already been discussed. The notes for which these lands were pledged were also placed in the hands of Attorney Richard Hobbs for collection. In the meantime Tucker, who originally held title to the lands, had made deeds to Hobbs, in order that he might pay the notes, and might apply the values of the lands to these debts. Having a double trust of this character reposed in him, Mr. Hobbs nevertheless conveyed the lands, which ought to have been subjected to the claims of his client, to H. H. Tarver, as trustee for creditors of Hobbs & Tucker; and Tarver, as we have seen, sold these lands for a triviality to a by-bidder designated by Richard Hobbs, and this by-bidder, under the direction of the same Richard Hobbs, attorney for these nonresident creditors, made the deed to the attorney's wife; and the National Bank of the Republic and other creditors owning Ragan notes were not only thus precluded from subjecting the values of these properties, but received nothing from the proceeds of the gratuitous trust deed. The fact is that not until the present bill before the court was filed had creditors ever known or heard of the trust created by their attorney for their benefit, or the sale, or any other part of the transaction resulting in the transfer of the trust fund which was their security to the attorney's wife. The Yale National Bank and Henry Talmage & Co., who had purchased the notes of H. H. Tarver, also secured by the same mortgage, were not more fortunate. They, too, intrusted their claims to Richard Hobbs as attorney. The foreclosure of their mortgage was likewise enjoined by Wooten & Jones, the attorneys who had been retained and paid by Richard Hobbs; and the title to the land which constituted the security to their debt finally reached the hands of Mrs. A. T. Hobbs, the wife of their attorney, who in the meantime did not apprise them of the manner in which their interests were being slaughtered. The Chemical National Bank was not more fortunate. All these assets of the bank, if worthless at all, were known by Hobbs & Tucker to be worthless at the time they were sold to the nonresident holders; but, so far from being worthless, it appears that they were amply secured by properties which might have been subjected to their payment. But if the rediscounts were all valueless, there would still remain assets of the bank, unaccounted for, which would amount to $158,399.20; and the inquiry will obviously follow, what has become of this large sum, which under ordinary conditions

would have been appropriated to pay the creditors of the insolvent firm? On the hearing in this case before the special examiner the defendant Richard Hobbs produced a list entitled, "Debts of Hobbs and Tucker Settled with the Assets of the Bank after the Failure." This was in his own handwriting, and sets forth the names of the creditors, and the amounts paid; the aggregate being $73,280.61. This list does not present an estimate, but a statement made with alleged exactitude. It otherwise appears that certain of these debts were paid in partial payments at different times, and a large number of them were settled, not in money, but by the transfer of negotiable paper held by the bank. It is noteworthy that this and another list now offered, which purports to be a statement of amounts paid to the creditors from individual property of Richard Hobbs, were not used or referred to on the hearing in the state court before Hawes, auditor. Indeed, on that hearing Richard Hobbs testified the assets of the bank were used in settlement of the debts of Hobbs & Tucker, as far as they went. He then estimated the assets at about $90,000, and said that they were not worth more than $20,000, the great bulk of them being totally insolvent. If this testimony was reliable, it is difficult to understand how from assets not exceeding $20,000 in value he succeeded in paying off $73,280.66 of debts, and there is no pretense that any of the debts were scaled. It further appears that, immediately after Col. Hobbs gave this testimony before the auditor, the judgment creditors in that case, who were attacking as fraudulent the conveyances of Richard Hobbs to his wife and other relatives, called for the production of the bills-receivable book of the bank, to be used in evidence, and it was then discovered for the first time that this most vital and important book had disappeared. In the absence of the book of bills receivable, the general ledger, and the general cash book of Hobbs & Tucker, the court has no adequate opportunity to test the accuracy of this list. It sufficiently appears, however, that it is not accurate in all particulars. Among the books of Hobbs & Tucker which did not disappear were found the personal or depositors' ledger and the memorandum cash book, and these show that on June 5, 1893, Hobbs & Tucker owed Mrs. Annie T. Hobbs $2,155.14, and that on that day, which was five days before the failure, she drew out this amount, and, further, that at the time of the failure her account was balanced, and Hobbs & Tucker were not indebted to her in any amount; and yet next to the last item on the list above mentioned of debts paid after the failure appears the following: "Mrs. Annie T. Hobbs, $2,155.14." An attempt is made by the respondents to show that Mrs. Hobbs was not paid this money in cash. They concede that it appears from the books that that amount was paid to her in cash, but they rely on her answer, and on the answer of Richard Hobbs, and on the affidavit of Richard Hobbs, and on the affidavit of H. A. Tarver to show that she was paid in notes. The upshot of this explanation is that Mrs. Hobbs was a depositor with Hobbs & Tucker, and that they had agreed to give her 8 per cent. interest on her deposits. Shortly before the failure, Mr. Hobbs, they contend, discounted for her certain notes, and drew checks on her account to pay for them, and left them

with Hobbs & Tucker for collection. One of said notes they collected a short time before the failure, and charged themselves with the proceeds as a deposit, and the other notes they used. The aggregate was in the neighborhood of $4,000. About the time of the failure, or shortly afterwards, they turned over notes of their own to the amount of those they had used and had collected; and after the failure Hobbs had an examination made of her account, and it appeared that she had been charged with an item of $2,000 which properly ought to have been charged to him. After giving her proper credit for that $2,000, and giving her interest upon her deposits as agreed upon, it left them still indebted to her $3,471.48. It would be unjustifiable for the court at this time to accept this indeterminate explanation, confronted as it is by the clear-cut evidence afforded by the contemporaneous entries on the books, made at a time when there was no opportunity for mistake, and no motive to recharge or otherwise falsify the account. If, however, it shall on the final trial be held proper to regard this list of debts paid as correct and satisfactory, there will still remain, of assets confessedly good and not accounted for, the sum of $85,118.54. Accompanying the above statement there was produced another list, also in the handwriting of Richard Hobbs, entitled "Debts of Hobbs and Tucker Settled after the Failure of the Bank by Richard Hobbs Out of His Individual Property." These debts, which it is alleged were thus settled, amounted to $57,058.58. It will be seen that all of these debts which Richard Hobbs claims to have paid out of his own property are offered as the justification of the numerous transfers of his property to his wife and to H. A. Tarver and Mrs. E. G. Tarver, which are attacked by the proceedings now before the court; and yet, accepting his own figures, all of these debts could have been paid out of the assets of Hobbs & Tucker not as yet accounted for, and there would remain still unexplained a balance of those assets amounting to nearly $30,000.

It also appears that A. W. Tucker, one of the partners, owned certain property individually. Some of this was conveyed by him to the creditors of Hobbs & Tucker. The great bulk of his property, however, shortly after the failure of the bank, was conveyed to Richard Hobbs to be used in paying debts of the firm of Hobbs & Tucker. Among these were 5,300 acres of land lying in Baker and Mitchell counties, before referred to as the Ragan lands. Tucker also conveyed to Richard Hobbs about the same time 405 acres of land in Lee county, and an undivided half interest in 1,225 acres more. These 405 acres Richard Hobbs on October 20, 1893, conveyed to William H. Newsome for $2,000; taking a mortgage to secure the purchase price, to be paid in five annual payments. Mr. Hobbs, in one of his affidavits, states that these Newsome notes were assigned to a Mrs. Du Pont and to Reich & Geiger. It appears, however, that only one of them (a note for $350) was assigned to Mrs. Du Pont, and that to Reich & Geiger was for only $237.91, as appears from the list of debts of Hobbs & Tucker "settled with the assets of the bank after the failure" referred to above. These two payments to Mrs. Du Pont and Reich & Geiger amounted to only

$587.91, which leaves $1,416.09 of the value of the 405 acres conveyed by Tucker to Hobbs for the benefit of creditors not yet accounted for. Nor was the half interest in the 1,225 acres in Lee county conveyed by Tucker to Hobbs for the same purpose more beneficial to the creditors. Hobbs suffered this to go to sale for taxes in the year 1893. These amounted to $16.20, and at the instance of Hobbs, who was present at the sale, this land was knocked off to his son, Richard Hobbs, Jr., at the price of $25. Under the law of Georgia, Hobbs might have redeemed this land in 12 months by paying the price for which it was sold at sheriff's sale, but he permitted this period to expire without redeeming it. Thus an attempt was made to benefit his son at the cost of creditors to whom he was indebted, and for whom he had accepted this land in trust, and to deprive them of the value of 612½ acres of land which was subject to their debts. These lands were afterwards levied upon under a mortgage fi. fa. in favor of Mrs. Annie E. Hamlet, and a claim was interposed by R. Hobbs for his son, R. Hobbs, Jr., and the claim was returned to Lee superior court to be tried. They were there finally subjected to the payment of the debts, but not until after Richard Hobbs had made a long and stubborn fight in favor of the manifestly fraudulent title which his son had acquired for the consideration of $25, and to land which had been conveyed to Hobbs for the benefit of creditors of Hobbs & Tucker. It is interesting to observe, further, that notwithstanding Mr. Hobbs had permitted this land to go to tax sale, and his son to buy it, he continued to exercise personal control of it, for on March 30, 1894, he conveyed the same land to W. S. Tarver, the consideration being stated at $750. It also appears that W. S. Tarver had not a dollar's worth of property, nor a dollar in bank. It also appears that Richard Hobbs owned at the time of the failure 2½ lots of land in Lee county, containing some 500 acres. This land he also suffered to go to tax sale for taxes for 1893, and at the sale the entire 2½ lots were sold to Mrs. Annie T. Hobbs for $21.15, although it appears by the affidavit of the sheriff that the lands were worth $2 an acre, or approximately $1,000. The sheriff also testifies that he was instructed by Mr. Hobbs to levy on the lands and sell them for taxes, and to have somebody bid the lands in for Mrs. Annie T. Hobbs, all of which was done; that the deed was made accordingly; and that Mr. Hobbs, who was present at the sale, paid him the money. It follows that this land was also not redeemed.

At the time of the failure of Hobbs & Tucker, Mr. Hobbs owned in his own right a large amount of property. This included brick warehouses and other valuable property in the city of Albany, and many thousands of acres of plantation and timbered lands in Dougherty, Baker, Decatur, Mitchell, Lee, Worth, and Calhoun counties, and other counties in this state, and also some lands in Florida. Without enumerating in detail the numerous properties in several counties which he exclusively owned and in which he had a half interest, it plainly appears that his holdings were worth, on his tax valuation, $89,641.50; and adding to this one-half interest in Florida lands, the worth of which appears from the consideration expressed

in the deeds, the value of his total real estate was $92,141.51. The annual rentals of this property were about $10,000, but this takes no account of large sums derivable from 6,525 acres of land exclusively owned by him, and a half interest in 1,790 acres, all lying in Baker county. These lands were valuable for timber, sawmill, and farm purposes. They were ostensibly sold to one Hudson, but not only did Hudson not collect the revenues or make any trades touching the sale of timber or leasing for turpentine, but the cotton raised on these lands was warehoused in the name of Mrs. Annie T. Hobbs, and when sold the proceeds were paid to her husband, acting in her name. When turpentine privileges were sold, the trades were made by Mr. Hobbs, and the drafts were drawn to his order, although Hudson signed the deeds or leases. Such a draft actually has been paid in this manner after this bill was filed. These facts are plainly apparent from the evidence, and yet the defendant Richard Hobbs in his answer states that Hudson had finished paying him for the land long before the filing of the original suit, and that "all interest that this defendant had in the said property by reason of said mortgage or for any other reason had been fully settled and satisfied, and that Hudson, so far as this defendant was concerned, was the full and complete owner of said property." He states further that he did not know of his own knowledge, but has it only on hearsay, that any turpentine or sawmill privileges had been sold on said lands. This recital is contradicted by the affidavits that Richard Hobbs himself made sales, fixed prices and terms, drew up the papers, and, in the presence of affiants, received the drafts given in payment. The original drafts made in payment of said sales, drawn to his order, or indorsed over to him, and indorsed by him in his own handwriting, and by him deposited to the credit of his wife, are also in evidence. Hudson, too, was a man of little means. All of these valuable properties were in the first instance the individual holdings of the defendant Richard Hobbs, and, in the ordinary course of legitimate business affairs, would have been available for the payment of the creditors of Hobbs & Tucker. While this is true, with the exception of a portion of his Worth county lands, returned for taxes at $1,400, and a half interest in a tract of land owned in Decatur county, returned for taxes at $750, which properties, as we have seen, were conveyed to the National Bank of the Republic, all the remainder of his real estate, amounting to $^{49}/_{50}$, according to the tax values, was soon found after the failure in the hands of his wife, Mrs. Annie T. Hobbs, or in the hands of her mother, Mrs. Tarver, or her brother, H. A. Tarver, or Hudson, the nature of whose holding has been above described.

These transfers to Mrs. Hobbs are supported by the respondents upon the grounds—First, that Hobbs & Tucker owed her money at the time of the failure; second, that Richard Hobbs owed her money at that time; third, that she paid or agreed to pay off the debts of the firm, and, under a circuitous and uniform system of transfers, became, as a result of such agreement and alleged payment, the purchaser of these properties, not from Richard Hobbs himself, but from the person or creditor to whom he should convey it as part of

the plan. In fact, however, the plan was as follows: Hobbs would convey a parcel of his property to some person, who would give a check or note, or both, for the purchase money, and at the same time the purchaser would enter into an obligation with Mrs. Hobbs to convey her the same property at some future time, when she should pay to him the same price he had just paid. Richard Hobbs would then take the money, or the money and note, and usually make an effort or pretended effort to pay a creditor. This effort ordinarily failed, with the result that he would pay the funds thus obtained on his alleged indebtedness to Mrs. Hobbs, and with the money or chose in action thus received she would satisfy the person who had bought the property from Richard Hobbs, and that person would then surrender to Mrs. Hobbs her note, and make her a deed to the property. This circuitous transaction, however, apparently efficacious to remove the property of the debtor from the reach of his creditors, to a court of equity, which looks through forms to substance, is nothing more than a voluntary conveyance of the insolvent respondent to his wife, with intent to hinder, delay, and defraud creditors, unless it appear that there was a valid and subsisting indebtedness from the respondent to the wife. In that event a direct conveyance to her in settlement of such indebtedness would have avoided many suspicious features which now thrust themselves upon the attention of the court.

This brings us to the inquiry, was there any such indebtedness on the part of Hobbs & Tucker to Mrs. Annie T. Hobbs as would support the conveyance of those large properties to her? The answer of Richard Hobbs directly and positively states that at the time of their failure Hobbs & Tucker were indebted to Mrs. Hobbs in the sum of $7,550; that, of this sum $2,140 was a note on Hayes & Heath, collected by Hobbs & Tucker "the very day that their doors were closed"; that Hobbs & Tucker used the money that day without the knowledge or consent of Mrs. Hobbs; that they did not pay her this money, but paid it by transferring to her a number of notes which belonged to them, and which they estimated to be worth $4,150. If the original indebtedness was $7,550, this payment of $4,150 to settle a $2,140 debt would leave, it seems, but $3,471.98 due from Hobbs & Tucker to Mrs. Hobbs. This reduction of the firm's indebtedness to her is modified, however, by the further statement of Hobbs that the $4,150 of notes which were given to her in lieu of the $2,140 were used by him in paying up some creditors of Hobbs & Tucker. Who these creditors were, his evidence does not inform us, but he states that he gave Mrs. Hobbs another note of $2,000 for the $4,150 of notes. A court seeking the truth finds it difficult to accept any such statement as this, in the face of the balanced books of Hobbs & Tucker, which show that five days before the failure Mrs. Hobbs drew out every dollar she had in bank. It is true that Hobbs & Tucker did collect $2,140 from Hayes & Heath for Mrs. Hobbs. This collection, however, was not on the day that the doors were closed, but it was collected on May 19th, more than three weeks before the day of failure. This in fact appears on the memorandum cash book of the bank. No bank officer would have

made such entry without the cash, for he would simply have charged himself with that amount. Besides, the affidavit of Heath shows that the payment was made in money at the date it appears on the memorandum cash book. It is plain from the personal ledger and memorandum cash book that, instead of being paid by transferring to her a number of notes, Mrs. Hobbs was credited on June 5th with $2,155.14 in cash. This was made up of the Hayes & Heath item, $2,140, and a balance of $15.14 which already stood to her credit. Besides, Hobbs & Tucker's books do not show any indebtedness of $7,550 to Mrs. Annie T. Hobbs at the time of the failure or at any other time, and the original list, in the handwriting of Richard Hobbs, of debts of Hobbs & Tucker "settled with the assets of the bank after the failure," states that the debt to Mrs. A. T. Hobbs was $2,155.14. Besides, the testimony of Richard Hobbs himself is strongly conflicting on this subject. With regard to this particular debt due from the firm to his wife, in his examination before Hawes, auditor, in the state court, he testified that Hobbs & Tucker owed Mrs. Annie T. Hobbs at the time of the failure $3,471.98; and at that hearing a pass book purporting to show the account of Mrs. Annie T. Hobbs with Hobbs & Tucker was offered, showing that there was due her by Hobbs & Tucker, June 10, 1893, $3,471.98. With regard to this pass book, H. A. Tarver, Jr., testified that it was correct; that "it has been copied from the ledger since the failure." This was the personal ledger of depositors' accounts, with which every pass book ought to agree and balance, and yet a reference to this ledger shows that they owed her nothing. Then this item appeared to be a depositor's balance on a depositor's pass book copied from the ledger. Now it has increased to more than twice its former size, and it is claimed to be not a depositor's balance, but a trust resulting from the misappropriation, without her consent, of the funds of Mrs. Hobbs to pay other creditors, whose names are not given. How is this indebtedness made up? The pass book does not show $7,550 owing to Mrs. Hobbs June 10, 1893. It does not show the subsequent payment of $4,150. It nowhere appears that the bank, in its bookkeeping, ever recognized itself as indebted to Mrs. Hobbs in the sum of $7,550. H. A. Tarver, Jr., it is true, testifies or makes affidavit that the pass book is made up by correcting errors of $2,000 in the books, and by adding interest. When we compare this statement with his testimony that the pass book was copied from the ledger, and when the ledger shows a total absence of indebtedness, his testimony cannot be accepted as accurate. But if the pass book, as written up by Tarver, is accepted as accurate, it, at best, accounts for an indebtedness of only $3,471.98. The difference between this sum and $7,550, which it is now insisted by the defendants that Hobbs & Tucker owed to Mrs. Hobbs at the time of the failure, is wholly unaccounted for. To recapitulate: When we consider that by the books, before there was any likelihood of tampering or alteration, her debt was only $2,155.14; that this was drawn out five days before the failure; that the original list, in the handwriting of Richard Hobbs, catalogues this debt, "Mrs. A. T. Hobbs, $2,155.14;" that it was first treated as a depositor's balance; then that it was augmented largely in amount,

and treated as indebtedness for funds misappropriated by the bank; and that every effort on the part of the creditors has failed to compel the production of those bank books, by which the good faith of this claim that the bank owed Mrs. Hobbs $7,550 could be accurately and satisfactorily tested,—we feel obliged to regard it, in the light of all the proof, as so unsatisfactory that it must be discredited altogether.

We must now consider the contention that Richard Hobbs individually owed his wife the sum of $18,270.45, and that the conveyances to her should be sustained in consideration of this alleged indebtedness. This amount is made up largely of notes which it is claimed that Richard Hobbs collected at various times, and, instead of delivering the proceeds to his wife, retained them until after the failure of the bank, and then charged himself up with the aggregate sum, with the interest annually compounded on each note. It is to be observed that none of these notes were produced in evidence, and yet, with transactions so numerous, it would seem readily competent, by process directed to the various holders of these paid or canceled notes, to have produced them before the court. This might have afforded evidence of cogent and valuable import. Indeed, on the hearing in the state court before Hawes, auditor, Richard Hobbs, after enumerating certain notes, testifies as follows:

"These notes I have mentioned all appear on the bill book from time to time according to the dates. Wherever I bought a note for her, I put it down on the book in her name. The entries were all made on the book long before I had any intimation that there was any trouble coming. The indebtedness to my wife is positively correct."

It is, however, true that in the subsequent examination in bankruptcy before Shelby Myrick, referee,—had since the cause under consideration was begun,—the following examination, with the answers of Mr. Hobbs, appears, and is now in evidence before the court:

"Q. You said this morning that you owed your wife a good, large sum of money. Have you any book or record that would show accurately how much you owed her on the 10th of June, 1893? A. No, sir; I tried to make up a statement from memory at that time, and swore to it before the auditor, Mr. Hawes."

And further:

"Q. Where are the books that show your transactions with your wife? A. I told you that I did not keep any books with her. Mr. Wimberly, you are a funny fellow. Q. I understand you to say that when the auditor's hearing came on, in 1896, that you then sat down and figured up this account as to what you owed your wife from recollection? A. Yes, sir."

To demand that the court should accept this contradictory testimony to establish an alleged indebtedness between husband and wife, much of it covering a period of 13 years, all of it bearing compound interest, with no written evidence, in the nature of books, notes, or other evidences of indebtedness, is certainly unusual, and as certainly deserves the most critical scrutiny. The alleged principal due from Richard Hobbs to Mrs. Hobbs is $13,372.99. Of interest alleged to be due there is $4,897.46. The respondent contends that each sum of his wife's money which he invested for her by buying negotiable notes during all the period mentioned is to be charged against himself, from the date each note fell due to the date of the

118 F.—41

failure of Hobbs & Tucker, with interest against himself annually compounded thereon. Thus the aggregate of the disputed indebtedness is created. There are two essential bases, both of which must exist to sustain this theory: The first is that he always invested her money for her, but that when the notes matured and were paid he never reinvested the proceeds; and, secondly, that every note in which he invested her funds was paid in full to him on the date of its maturity. Are these fundamental postulates themselves supported by the evidence? Mr. Hobbs, relatively to the great majority of people among whom he lived, was a wealthy man. His income from his properties was $10,000 a year. He was, besides, a successful lawyer, in large practice. It appears that he had money of his own idle in bank during all this period. What induced him, then, in a manner wholly contradictory to the careful business methods by which he had amassed his large fortune, to leave his own money in bank, and take his wife's money, use it for some purposes, of which the evidence affords no explanation whatever, fail to account for any portion of it during all these years, and pay her 8 per cent. interest annually, compounded? He kept neither memorandum entry nor record of his dealings with the moneys he alleged to be. his wife's. In his bank account the depositors' ledger does not show an entry corresponding with the payment of any of these notes or obligations alleged to belong to Mrs. Hobbs and paid to him. He gives us no explanation of the use to which he put this money, or where he kept it, or what his object was in keeping it. A most careful business man, and presumably devoted to his wife, according to his testimony he had given her large sums, and yet no memorandum was made by him which could be used by her in case of his death to show that he had appropriated the bulk of her estate to his own purposes. In view of these facts, the evidence offered by the respondent to show the existence of this debt is not such as the law requires. It is a settled doctrine that "the evidence upon which an indebtedness from a husband to his wife should be established in a case where the former is insolvent should be clear and convincing, in order to support a conveyance then made to her." Bank v. Cowan, 75 Fed. 145, 21 C. C. A. 279. Besides, a careful analysis of the account of Mrs. Hobbs with the banking firm of Hobbs & Tucker discloses that she has received certainly a very large portion of the proceeds of the investments which her husband made for her, some of which he catalogues as evidence of his alleged indebtedness to her. According to the testimony of Mr. Hobbs given before Hawes, auditor, his indebtedness to his wife began in 1886 with a loan of P. L. Hilsman. This is the first item of the detailed account of indebtedness of Richard Hobbs to Mrs. A. T. Hobbs which he has furnished and verified by his affidavit, and which amounts, with principal and interest compounded, to $18,275.45, all of which was for her money that he alleges he used prior to the failure, and which is the alleged consideration of the transfers to her of various properties which are attacked by complainant's bill. It appears from the evidence this Hilsman debt, charged to be $5,000 principal and $1,200 interest, was not paid as stated in the account. It did not extend over a full period of five years, but

was settled in two payments. Hilsman sold the property mortgaged to secure the debt to M. C. Heath for $6,000. This appears from the deed of Hilsman to Heath, dated April 2, 1887. This deed was given with the understanding that Heath was to pay Mrs. Hobbs the amount that Hilsman was due to her, and Heath executed a mortgage of the same date to Mrs. Hobbs in pursuance of that agreement. The books of Hobbs & Tucker show that on April 13, 1887, a few days after this transaction, Hobbs was credited with $1,796.13, and that Hilsman was credited with $1,208.87. Hilsman testifies that the amount placed to his credit was derived from Heath, and was a part of the transaction with Mrs. Hobbs, and that the $1,796.13 placed to Hobbs' credit was the amount due by Hilsman to Mrs. Hobbs. In other words, Hilsman received from Heath $3,005; that he deposited $1,796.13 to the credit of Hobbs; and that he deposited $1,287 to his own credit. This was half of the purchase price then due from Heath. It also appears that on the next day Mr. Hobbs was charged on the books of the bank with $1,796.13, and Mrs. Hobbs was credited with $1,267. The evidence relating to the Hilsman-Heath transaction shows that, for the balance due Mrs. Hobbs, Heath gave his note for $3,000, secured by a mortgage. This mortgage is in evidence, and it appears that it was canceled June 4, 1890, and on that day Mrs. Hobbs is credited on the books of Hobbs & Tucker with a deposit of $3,280. It is further shown that Heath was credited with a deposit, and the receiver found the two deposit slips pinned together, showing their intimate connection and their connection with Heath. It further appears that when we add $1,796.13 received by Mr. Hobbs, and the $3,200.80 received by Mr. Hobbs from Hilsman, we have $4,996.93, or only $3.07 less than the entire amount of the loan to Hilsman. This trivial discrepancy cannot, we think, rationally preclude or avoid the conclusion that this debt was paid in full to Mrs. Hobbs, and that, if Hobbs was indebted to her on that account, it could only be the difference between $1,267 which he paid Mrs. Hobbs on April 14, 1887, and the $1,796.13 which he received from Hilsman on the previous day; but since Mr. Hobbs testified with positiveness that none of this was paid, and that the entire amount is yet due, we feel obliged, in the presence of facts above recited, to conclude that his testimony on this point is altogether erroneous, and, as there is no other satisfactory evidence to support this item of his alleged indebtedness to his wife, we are forced to the conclusion that it does not, in fact, exist at all. It was, of course, impossible for the complainants to furnish the court with the material testimony relating to each item of the catalogue of indebtedness which Mr. Hobbs testifies he owes to his wife, but where it appears from the proof relating to a number of items that the list or catalogue is unreliable in large part, in view of the close scrutiny the law directs in such transactions between husband and wife, we feel obliged to disregard the statement of indebtedness altogether. To illustrate: In this statement Mr. Hobbs gives Mrs. Hobbs credit for the proceeds of a $125 note paid to him by Sam Farkas on December 1, 1889. Now, Sam Farkas, in his affidavit, deposes that he never borrowed or owed Mrs. Hobbs any amount on note or otherwise, and did not pay Hobbs this sum for her. He

testifies, however, that in December, 1889, he bought from Hobbs himself certain lots in Albany, for which he paid him $125 in cash; and there is in evidence a deed from Hobbs to Farkas, dated December 4, 1889, conveying, for the consideration of $125, an undivided one-half interest in lots Nos. 63 and 65 on South street, the whole of each lot containing one-fourth of an acre, more or less. This is a deed of warranty, and is signed by Hobbs in his own right. This instance seems a material transaction, so distinct in its character that there could have been no mistake or misstatement about it whatever, plainly to discredit the reliability of the general statement made by Mr. Hobbs of his indebtedness to Mrs. Hobbs. Again, Mr. Hobbs claimed to have received from Mrs. Hobbs on May 14, 1890, a cash item of $142, which he has not accounted for to her. And yet the books of Hobbs & Tucker show on February 16, 1891, Mrs. Hobbs was credited with $142, and the original deposit slip, in the handwriting of Mr. Hobbs, shows the money was deposited by him for Mrs. Hobbs. He further claims that he owes Mrs. Hobbs $1,522 for money paid him by G. E. Hoppie on a note dated December 4, 1890; and yet the books of Hobbs & Tucker show that Mrs. Hobbs is credited by Hoppie with $1,522.50 principal, and interest $122.70. This was done on December 8, 1891, and the interest is the exact interest for one year and four days at 8 per cent.

It will, perhaps, not be justifiable, in view of the necessarily great length of this opinion, to discuss in detail a number of other items in this account where Mr. Hobbs has charged himself with moneys alleged to be due to Mrs. Hobbs to make up the sum of his alleged indebtedness to her, in nearly all of which his inaccuracy, proceeding perhaps from infirmity of memory, is equally apparent. We, however, call attention to a few instances: With regard to the note of Hoyt, it appears from the books that Mrs. Hobbs was paid principal and interest. With regard to the note of Alford & Sloan, it appears that Mrs. Hobbs had only a half interest in the land sold, and one-half the purchase price, together with interest, is credited to her on the books of the banking firm. Hobbs charges himself with the proceeds of notes alleged to be due to Mrs. Hobbs by one M. M. Gambetti, when it clearly appears from the testimony that Mrs. Hobbs did not own the land sold to Gambetti. It further appears from an analysis of the interest charges Mr. Hobbs makes against himself in Mrs. Hobbs' favor that, even if it should be conceded that she did not receive the proceeds of the notes which appear in her deposit account, he has calculated interest upon a fallacious basis, and compounded it from the 1st of each January, when in fact the notes were paid at various periods throughout the years covered by the transactions referred to in his account. It further appears that the total deposits of Mrs. Hobbs with Hobbs & Tucker amounted to $15,697.74, and that before the failure of Hobbs & Tucker the last balance on this account, amounting to $2,155.14, as we have seen, was drawn by her from the bank. It is not contended that any of this money was paid by Mrs. Hobbs to Mr. Hobbs, but, on the contrary, he distinctly testifies that he collected various sums which he claimed to be due her in his statement, and kept the money in his

iron safe. On the whole of the moneys belonging to Mrs. Hobbs so many separate sums are accounted for as received and expended on her own account, which Mr. Hobbs now testified he appropriated for his own use and has never paid her, and this is so clearly shown by such books of the bank as the court has been able to obtain, and by the testimony of witnesses who, so far as the evidence discloses, are wholly disinterested that, in view of the exactitude of proof required in such transactions between husband and wife, we feel obliged to disregard and discredit as an entirety his alleged indebtedness to his wife of $18,270.45.

The materiality of this inquiry, which has thus resulted in what seems a demonstration, under the law governing such cases, that this indebtedness claimed by Mr. Hobbs as due his wife was fictitious, will more distinctly appear from the subsequent inquiry into the validity of those transfers by which his great and valuable holdings of real estate finally reached the possession and control of Mrs. Hobbs, to the great injury of his creditors. Take, for instance, the transfer to C. W. Arnold of 2,166½ acres in settlement of certain debts amounting to $6,343.96. Arnold on the same day agreed to convey these lands back to Mrs. Hobbs at the same price, but this is not the whole transaction. Hobbs had transferred to C. W. Arnold the Albany Inn and the Rawson Corner property, to which he held title, for $5,000, and this Arnold also contemporaneously agreed to convey to Mrs. Hobbs at the same price; but in the latter transaction it is not pretended that Mrs. Hobbs paid any debt of Hobbs & Tucker. Mr. Hobbs contends that he paid $5,000 for Mrs. Hobbs, but that it was paid by him on the alleged debt of $18,270.14. We have seen, however, that there was no such debt. This transaction is a typical one. Nothing can more clearly demonstrate the propriety of this bill to redress the wrongs of the creditors than certain testimony of Arnold on cross-examination, and now in evidence here:

"Q. What was the agreement between you and Mrs. Hobbs at the time you bought this property as to who you should deed it to? A. I think that a day or two afterwards (I do not remember whether the same afternoon or the next day) I made Mrs. Hobbs a deed, and she made me her note. Q. Was it not agreed between you and Hobbs at the time you bought this property and took this deed that you should make a deed to it to Mrs. Hobbs, and that she should give you her notes and mortgage for it? A. I cannot swear positively that there was an agreement of that kind. Possibly the matter was discussed and talked about. Q. You sold it to her on credit for $5,500? A. Yes. sir. Q. Was it not agreed at the time the sale was made to you, as a part of the sale, that you should sell this property to her, and deed it to her, and take her note and mortgage? A. I deeded it to her, and took her note. Q. Was not that the agreement at the time the trade was made with you? A. I do not think there was any agreement of that kind entered into. Q. Was not that the talk between you and him? A. There may have been some talk of that kind,—that I would deed it to her and she give me her notes,—but there was no absolute agreement. Q. Did you not sell it back to her on the same day? A. I do not remember whether it was the same day or the day after. The papers will show. Q. Why did you buy five thousand dollars' worth of property, and pay five thousand dollars cash on it, and then turn right around and sell it on long time for five thousand five hundred dollars? What was your object in doing this? A. I and Mrs. Hobbs and the Hobbs family had been friendly a long time, and I always try to help my friends when they get in a tight place in any way,

Q. You did it, then, to befriend Mrs. Hobbs? Was that it? A. That is the reason I purchased the property. Q. So she could get it? A. I do not know that I put it that way. I gave you the facts. We had been friendly,—Mrs. Hobbs and the Tarver family,—and I always try to help my friends when I can do it in a way that is right and proper. Q. You did this for that reason,—to help your friends? A. Well, five thousand dollars is some money, and I do not stick money down foolishly. Q. You did this because you were friends? A. You ask me my motive, and I give it to you. That is the reason I bought the property. Q. You say the city assessed the Rawson corner at eight thousand dollars? A. I said that was my recollection. I may be wrong. Q. Was your check on the bank for that money paid? A. I took the check up with the cash money. Q. It has never been paid back to you? A. No, sir; I hold Mrs. Hobbs' note for it yet. Q. Was it paid to anybody for you,—that five thousand dollars? Was it paid to anybody else, or your wife, for you or for them,—that five thousand dollars that you paid Hobbs? A. Not to my knowledge. Q. Would you know it if it had been paid to your wife? A. Possibly I might, and possibly I might not. Q. Was there any agreement that that money should be paid to anybody else, between you and Hobbs, or Mrs. Hobbs,—that five thousand dollars,—or between you and any one else for them, or any one else, that that money should be paid to your wife or any one else? A. You don't want me to state anything I have heard, do you? Q. Was there ever at any time any agreement? A. Define an 'agreement,' please. Q. It is just talking. (At this point defendants' counsel asked to be allowed to consult, which they did for several minutes.) Q. Do you want me to ask the question again? Was there ever any agreement or any talk or any incident at any time between you and Capt. Hobbs or Mrs. Hobbs, or any one for them, that this money that you paid for his city property should be refunded to any one? A. If I understand the word 'agreement,' it means that it takes two parties to constitute an agreement; that I must make a request, and the other party must make an assent to my proposition, and, if one requests and the other assents, that is an agreement. If I make a request of you, and you do not assent, or keep your mouth shut, say nothing, and a matter occurs, you do not understand that to be an agreement, do you? · Q. Yes, I do, if I do not say anything. A. Have not you frequently had that occur when you were deceived? Q. Yes; and I have been deceived when they proposed, as well. Tell the court exactly what occurred on that line. A. I gave the money to· Capt. Hobbs. Q. Tell what happened at that time. A. I gave the money to Hobbs, and took up the check. Q. What was he to do with the money? A. As far as an agreement between me and him that he was to do something with it, and on your definition of the word 'agreement,' I did not see him do anything with it. Q. What did he say to you he would do with it? A. I think he said he would eventually arrange the matter so the money would accrue to me. Q. How? A. By coming through some channel. Q. What channel? A. Through some of his folks or some of my folks. Q. How was he to do it? A. I presume I left that with him. Q. What did he say to you he would do with it? A. I think he left me to understand, without saying in so many exact words, what he would do. I think he left me to draw conclusions as to what he would do. Q. What was that? A. As I said to you, that the money would accrue to me in some way through some of his family or some of my family. Q. He was to deliver it to them for you? A. No, sir; I do not think that he was absolutely to deliver it. Q. Did you pay him the money to keep, or was it to come back to you? A. I paid him the money for that check. Q. Was he to keep it, or was it to come back to you or your family? A. I presume it was to come back to me in some way. Q. Was not that the understanding? A. There might have been that understanding. Q. Do you know now what became of that amount of money? Have you been without it ever since then? A. I have not been without an equal amount of money since then. Q. I mean this particular five thousand dollars. Where has that been since you paid it to him? A. I have had some money since that date. Q. Representing that five thousand dollars? A. I get some money every once in a while from my wife. Q. Have you told all you know about that five thousand dollars, and where it went to, and has

been ever since? A. No, sir; I do not think I have. Q. Tell it all. You are sworn to tell the whole truth. A. I have had the use of the money, or a large portion of the money. I cannot tell you where it is now. The money is invested and loaned out. Q. By you? A. Some of it has been. Q. What have you done with the balance of it? A. My wife has got a little, there is some in the bank, and a little in the guano business. Q. You and your wife have had the use of it ever since? A. Yes, sir. Q. What are you holding that note and mortgage for? You have the money, you say. What was the understanding about your holding the note and mortgage? A. There has been no understanding about my holding the note and mortgage. Q. They have never called on you for the note and mortgage? A. No, sir; they have not. Q. Have you got the note and mortgage yet? A. I know I have the note, and I think I have the mortgage. Q. They do not owe you anything on it? A. I think the note could be collected. Q. You have got the money that it represented? A. I have got some money. Q. Have not you got some money that that note and mortgage represents? A. Do you mean entirely? Q. The money you let go that covers that transaction. What you are holding that note and mortgage open for? A. The note has not been paid. Q. You have answered that you and your wife had had that five thousand dollars all the time. A. I did not say all the time. I said some time since then. Q. How long since then? A. I do not remember exactly. Q. Was it a day? A. It may have been a day, or it may have been longer. Q. What are you holding them for? A. It never has been paid. Q. Yet you have had the five thousand dollars from within a day of the time you paid it out. What would you call payment of it? A. A note is not paid until it is canceled. Q. If I have got your note, and you give me the money, have not you paid it? A. It is a negotiable paper. Q. Your construction is that if the note is not canceled it is not paid? A. I believe that is the legal construction. Q. Do you hold any bona fide debt against Mrs. Hobbs that you expect to collect? A. I should not press it. Q. Do you hold any bona fide debt against her that you expect to collect? A. I cannot answer that. Q. It is a plain question. Do you hold any bona fide debt against Mrs. Hobbs that you expect to collect from her? A. No, sir; I do not."

It, perhaps, did not occur to this witness, in his effort to aid his friends, that he was lending his assistance to hinder, delay, and defraud creditors, and that, however amiable may have been his motive, the transaction could not be deemed amiable by a court intrusted with the administration of justice.

There were two transactions with John A. Davis. Hobbs & Tucker were indebted to Carhart, an intimate friend and a favored creditor of Mr. Hobbs. A valuable piece of property was conveyed to Mr. Davis by Mr. Hobbs for $5,000. Davis paid $3,000 in money, and gave his note, payable to Capt. Hobbs, for $2,000. This was done with the understanding that Mrs. Hobbs should buy the property from Mr. Davis. This arrangement was carried out, and repayment was made to Davis to the extent of $2,000 by returning him his note for that amount. This note, it was contended, was given to Mrs. Hobbs by Mr. Hobbs as a partial payment on his suppositious debt of $18,000. In the other transaction between the same parties, Mr. Davis paid to Mrs. Hobbs $4,000, which Mr. Hobbs ostensibly paid to Mrs. Hobbs on the alleged debt of more than $18,000, and this money Mrs. Hobbs handed back to Davis, whereupon Davis reconveyed to her. It will be observed by these transactions while one favored creditor may have been paid $3,000, yet Mrs. Hobbs is made to receive $6,000 on an indebtedness to her which is not shown to exist, and highly valuable properties, which ordinarily would be subject to the creditors of Mr. Hobbs, have been hitherto protected from

their every effort to enforce their claims against it. Again, Mr. Hobbs, after the failure, conveyed to Askew city property in Albany, termed the "Welch Corner." The consideration named in the deed was $6,453.10, and yet it appears from Askew's affidavit that Mrs. Hobbs repurchased from him this property for less than $3,000. It is true that his debt against Hobbs & Tucker, less a discount he conceded of $800, was paid to him, and in the deal Mrs. Hobbs received $2,300, also to be credited on a debt due her, the existence and validity of which is not, as we have seen, satisfactorily demonstrated. Again, with regard to what is termed the "Odum Transaction," it appears that Mr. Hobbs conveyed to Mrs. Hobbs certain farm lands owned by him in Baker county; the consideration of the conveyance being $1,391, represented by 17 shares of the stock of the Albany Fertilizer & Improvement Company. This stock, with $25 in cash, was conveyed to Mrs. R. B. Odum to settle a debt of Hobbs & Tucker to her. The stock finally turns up in the possession of Mrs. Hobbs. When the transaction is ended, Mrs. Hobbs is in possession of the Baker lands. She is also in possession of the stock of the Albany Fertilizer & Improvement Company, which was delivered to Mrs. Odum for the Baker lands. Thus, while the debt to Mrs. Odum is adjusted, Mrs. Hobbs receives its twofold value, and the creditors of Hobbs & Tucker are injured by at least one-half of her gain by the transaction. A final transaction of this general character was that of F. F. Putney, who was president of the Albany Fertilizer & Farm Improvement Company; this being the company in which Mrs. Hobbs became the owner of $141^{24}/_{100}$ shares of stock which had been owned by A. W. Tucker prior to the failure. Mr. Putney also appears to be a close friend of the family. A body of land was conveyed to Putney by Mr. Hobbs, and on the very day it was reconveyed to Mrs. Annie T. Hobbs for identically the same consideration; and it is plain from the evidence that it was the understanding in advance that Mrs. Hobbs was to become the owner at the same price. It appears further that part of the place was sold by Mrs. Hobbs for almost enough to pay the entire price, leaving her the bulk of this property for a trivial outlay. When these transactions are summed up, it will be observed that a very small sum of the indebtedness of Hobbs & Tucker was settled, when it is compared with the total amount of property which is thus circuitously conveyed to Mrs. Hobbs and the other relatives. The Welch corner was conveyed for $6,453.10. The amount received by the creditor was less than $3,000. The consideration of the two lots conveyed to John A. Davis aggregated $9,000. Of this amount, according to the testimony of defendants themselves, $3,000 was paid to a creditor, namely, Carhart, and $7,000 of collateral held by Carhart was released to them. In the two Arnold transactions the values aggregated $11,343.96. In the one it is not contended that any money was paid to creditors, and in the other it is claimed that Arnold was paid, individually and as treasurer of the Albany Fertilizer Company, $6,343.96. In the Putney transaction the value conveyed was $———, and the amount paid to creditors was $3,237.89. Carhart & Bros. were paid $3,000, and thus collateral was saved to Mrs. Hobbs which was actually worth, on the basis of the

dividends paid in liquidation, the full amount of that sum. Including the debt to Mrs. Odum, the total amount paid creditors by all these transactions was $13,972.85, from which should be deducted the amount paid to Carhart, which was nothing more than a redemption of collateral of the full value; and it further appears from the evidence that the real estate and stock above mentioned which resulted to Mrs. Hobbs, estimated at taxable values at the time of these conveyances, amounted to $———.

A most vital inquiry in this connection is to ascertain the source of the fund with which these partial payments to favored creditors were made, with results so beneficial to Mrs. Hobbs, and, as a consequence, to her husband. It nowhere appears in the evidence that Mrs. Hobbs at the time of the failure had any such sums of money as were paid out in these transactions. She returned no money for taxes as the law requires. She realized no money from the sale or mortgage of property by her individually. The rentals of her property amounted to only about $1,400 per annum, from which must have been deducted taxes, insurance, etc. On the contrary, Mr. Hobbs had not only his professional income, but an income of $10,000 per annum from his properties; and it will be seen that the considerable sums realized by him from turpentine leases, sales of sawmill timber, farm operations, etc., his professional fees, and salary as judge, went into the account of Mrs. Annie T. Hobbs. Nor can it be forgotten that the surplus of assets of Hobbs & Tucker remaining unaccounted for were not only ample to have paid every dollar which Mrs. Hobbs may have offered to obtain the title of Mr. Hobbs' real estate in these circuitous transactions, but are, indeed, sufficient to pay every debt which the parties complaining are now seeking to enforce. It is, however, said that the creditors refused to take the lands, which, as we have seen, were finally transferred to Mrs. Hobbs, and that the plan he adopted was the only feasible method by which he could hope to pay the debts of Hobbs & Tucker. Upon this subject it will suffice to say that they were under no obligation to accept a tender of real estate in satisfaction of their debts. Nor does it appear that the price at which he made the offers was anything like as moderate as that for which it is alleged Mrs. Hobbs secured these lands. For instance, it appears from the evidence of Askew that he offered the Malone place to him at $3 an acre. Mrs. Hobbs afterward bought this at 33⅓ cents per acre. Nor does it appear from Askew's affidavit that he refused to take the land unless Mrs. Hobbs would agree to buy it back at the same price, but he swears that this was suggested to him by Mr. Hobbs, and he was compelled to assent to this condition in order to obtain a settlement of his debt. Nor does it appear that the larger creditors of Mr. Hobbs, some of whom are parties to this bill, were disposed to be grasping with him in his difficulties. We find some of these leaving their claims in his hands as their attorney, and there they remained until the members of his family brought legal proceedings to defeat the enforcement of the claims which they had intrusted to him for collection. During all this period of trustfulness and indulgence on the part of his creditors, it is clear that he was diligently putting every value he pos-

sessed beyond their reach. This he did, as we have seen, by various transfers to members of his family,—some of them by tax sales at ridiculously inadequate prices; at another time, by the conveyance of large and valuable properties to H. H. Tarver as nominal trustee for certain creditors, who, as we have seen, did not receive a cent from the proceeds of the alleged trust, the value of which, as we have seen, is now possessed by Mrs. Hobbs. For all the purposes of the present hearing, it is plain that the ramifications of this entire scheme were made to hinder, delay, and defraud creditors. His entire bank account was transferred. He thus strips himself of every available asset, and admits that he did so to prevent garnishment. Entering into this account are the proceeds arising from the sale of property which he owned, and which he does not pretend were ever applied as a credit on his alleged debt to his wife. Besides, since the abortive effort in the state court to subject these properties to his indebtedness, other property has been discovered, which was transferred to his wife, the existence of which was unknown to the creditors at that time.

With regard to the conveyances of valuable city lots in Albany to Mrs. E. G. Tarver, it will suffice to say that, for the purposes of this hearing, the evidence seems clearly to indicate that they belong to the same general scheme to hinder, defraud, and delay creditors. This property is described in a deed from Richard Hobbs to Mrs. E. G. Tarver dated August 14, 1893, and comprises half of north lot No. 88, also lots 90, 92, three-fourths of lot 94, all of lot 95 on South street, and lots 53, 55, 57, and 59 on Mercer street. The consideration of this deed was ostensibly $5,000. Contemporaneously with its execution Mrs. E. G. Tarver executed to Richard Hobbs a mortgage upon the same property to secure notes of even date, payable to Richard Hobbs or bearer, in the sum of $1,666.66 each, with interest from date, payable one, two, and three years from date, respectively. Two of these notes were sent to the Yale National Bank September 28, 1895, and neither of them, or any part thereof, has been paid. It is claimed by the defendant Mrs. Tarver that the other note has been paid by her, but it is not shown how or when payment was made. It clearly appears from the evidence that, at the time of the failure of Hobbs & Tucker, Mrs. Tarver had no money to her credit in any of the Albany banks, and had never had a deposit with either of them, although Albany had been her home for a number of years. Her entire deposits with Hobbs & Tucker for two years prior to the failure had amounted to only $409.55, and at no time after October 28, 1891, had she to her credit with Hobbs & Tucker more than $140.05. She returned no money for taxes in 1893. If she had made any payment on this alleged purchase from Richard Hobbs, it never got into his bank account. The execution of this conveyance was a little more than a month after the failure of Hobbs & Tucker, and Mrs. Tarver's failure to pay either one of the notes given for the purchase of this property, and her close relationship with Richard Hobbs, —she being his mother-in-law,—taken in connection with what follows, seem to indicate with distinctness that this transaction was a part of the same general scheme to defraud. The other transaction with

Mrs. E. G. Tarver may be termed the John T. Davis conveyance.     Two days after the deed we have just described, namely, on August 16, 1893, Richard Hobbs conveyed to Mrs. E. G. Tarver, by deed, for the apparent consideration of $7,945, a large number of lots in Albany, which may be termed wild or unimproved lots.     Mrs. Tarver contends that this conveyance was made to her under the following conditions: Hobbs & Tucker were indebted to John T. Davis, a banker of Columbia, Ala., for $7,945.     Richard Hobbs had exhausted his resources, and was unable to raise money to pay Davis.     Her son H. H. Tarver was largely indebted to Hobbs & Tucker, and Davis finally agreed to accept a note made by H. H. Tarver, if the defendant would indorse the same, in settlement of the said debt, and, owing to her relationship to Hobbs and her son, she consented to make said notes, provided she was secure, and Hobbs gave her the lands for her indorsement; that she duly indorsed said notes in accordance with her agreement; and that neither Hobbs nor Tarver have ever paid one dollar thereof, but that said notes fell upon her, and she paid them.     Hobbs and Tarver testify to substantially the same facts.     Hobbs testified that Davis took the note for her indorsement, and receipted the debt of Hobbs & Tucker.     This testimony was given before Hawes, auditor, in the proceeding in the state court.     In this proceeding, for the first time, John T. Davis himself is called as a witness.     It appears clearly from his testimony that not only did Mrs. Tarver not pay the notes to him as she has testified, but that he was compelled to place his notes for collection with the First National Bank of Albany, Ga., and when the note became due the same was not paid, and affiant made inquiry and found that the said H. H. Tarver was bankrupt at the time the note was made, and that Mrs. Tarver, the indorser, refused to pay the same. He took the advice of counsel, who advised him, Mrs. E. G. Tarver being a married woman, that her indorsement could not be enforced, and after much difficulty he secured a compromise of about 30 cents on the dollar; and the evidence very strongly points to the conclusion that the money paid on the compromise was paid, not by Mrs. Tarver, but by Hobbs himself.     It therefore appears that Mrs. Tarver continues to hold the property transferred to her in consideration of her indorsement, which, at her own valuation, is worth $7,945, and which was given in for city taxes in Albany the year of its conveyance for $11,500; and in the year 1894, when the note which she did not pay fell due, it appears that she returned this property for city taxes at $12,000.     From this recital it seems obvious that this is merely another incident in the general scheme to dispose of the property of the respondent Hobbs so that it could not be subjected to the payment of his debts.     Another transaction in the same general scheme is the conveyance of lots 2, 4, and 5 on State street, and 1, 2, 3, 5, 7, 9, and 11 on South street, a small lot on southeast of Front street to the river, and a lot between said street and South street, lots 95 and 97 on South street, lot 54 on Mercer street, and one-half of lot 50 on Tift street, all in the city of Albany.     These lots were conveyed by Richard Hobbs to O. F. Tarver January 5, 1894, with three other lots.     O. F. Tarver, the grantee, was absolutely penniless.     He returned only his poll tax. He had never had a deposit in an Albany bank.     The fact that he

had purchased landed property of such value seems to have attracted general attention, although not the attention of O. F. Tarver himself. This is developed in the testimony of S. W. Smith, ordinary of the county, now before the court. Smith stated that, about a year after the conveyance to O. F. Tarver, that individual came to his office and wanted to borrow some money. Smith told him that he could only lend money on real estate, whereupon Tarver said that he did not have any real estate. Smith states:

"I told him he must be mistaken; that there was some on the records in his name. He asked me to let him see it, and I took him to the book and showed it to him. He seemed to be surprised, and went away whistling, and said no more about it. He said he did not have any real estate, and I took him to the records and showed him the deeds. I think it was some city property. If I remember right, Capt. Hobbs made the deed to him, though it may have been Hobbs & Tucker."

There are other transactions with other parties, relatives, friends, and business associates, fully described in the bill and amendments, to the same general character, all marked by the same general features, and all of which the evidence, we think, plainly indicates that they were conveyances made to hinder, delay, and defraud creditors of Hobbs & Tucker and of Richard Hobbs.

There is a great deal of evidence in the extensive record which relates to the particular transactions. This evidence bears out in almost every particular the conclusions which the court has drawn from the general survey of the case hereinbefore taken. It is not deemed essential upon this hearing to examine more in detail than we have already done the evidence relating to each transfer attacked as fraudulent, and intended to hinder and delay creditors. The opinion of the court, indeed, upon this hearing, is not conclusive of the rights of the parties, except in so far as the appointment of a permanent receiver may affect them. We have very anxiously and carefully considered the evidence, the comprehensive and painstaking oral arguments of counsel and the elaborate briefs and reply briefs which have been filed. With every disposition to accord the distinguished and aged lawyer, soldier, and jurist who is the principal defendant in this case every right to which he is entitled, we are nevertheless, by the overwhelming character of this evidence, constrained to conclude that the great mass of his property has been conveyed to his wife with the intent to hinder, delay, and defraud his creditors, and that such consideration as was nominally paid for such conveyances was, in the main, derivable from the assets of the insolvent firm of Hobbs & Tucker, which assets the creditors were equitably entitled to apply to the payment of their debts. The appointment of a receiver is tantamount to an equitable levy upon all of the property thus subject, or which in contemplation of equity should be subjected, to the satisfaction of the demands of creditors. No other remedy, under such circumstances, is so adequate; no other, indeed, adequate at all. It may be possible that upon the final hearing of the cause, if that stage in the proceeding is reached, the examination of all the witnesses on oath, and the production of evidence now not before the court, may induce a different conclusion. As our duty, however, now appears, the appointment of a permanent

receiver to take charge of all the properties alleged in the bill to be fraudulently transferred to each and every one of the parties defendant is inexorably demanded by the evidence, and an interlocutory decree will be entered to that effect.