TIFT et al. v. SOUTHERN RY. CO. et al.

(Circuit Court, W. D. Georgia, S. D. June 28, 1905.)

1. CARRIERS—FREIGHT CHARGES.

The general rule is that, the greater the tonnage of the commodity transported, the lower should be the rate of freight charges for such transportation.

2. INTERSTATE COMMERCE COMMISSION—CONCLUSIVENESS OF FINDINGS.

Explicit law, the settled policy of the government, the practical principles of reason and justice require that, save for controlling reasons of law or fact, the national courts should not discredit or disparage the conclusions of the interstate commerce commission.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Commerce, §§ 138–145.]

3. SAME—FINDINGS OF FACT.

The findings of fact set forth in the report of the commission are in all judicial proceedings deemed prima facie evidence as to each and every fact found.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Commerce, §§ 138–145.]

4. PRIMA FACIE EVIDENCE.

Prima facie evidence of a fact is such as, in judgment of law, is sufficient to establish the fact, and, if not rebutted, remains sufficient for the purpose. Mr. Justice Story, in Kelly v. Jackson, 6 Pet. 631, 8 L. Ed. 523.

5. INTERSTATE COMMERCE COMMISSION—REPORT—PRESUMPTIONS—BURDEN OF PROOF.

The act to regulate commerce creates a rule of presumption in favor of the commission's report, which on its introduction in evidence changes the burden of proof, and casts it upon that party against whom the report is made.

6. RULES OF EVIDENCE—LEGISLATIVE CONTROL.

The Legislature, subject only to the limitations of evidence expressly enshrined in the Constitution, has entire control over the rules of evidence, and by statutory enactments may alter, change, or create them anew.

7. CARRIERS—FREIGHT CHARGES.

The reasonableness of a rate of charge for transportation is eminently a question for judicial investigation. Justice Blatchford, in Chicago, M. & St. Paul R. R. v. Minnesota, 10 Sup. Ct. 702, 134 U. S. 418, 33 L. Ed. 970.

8. SAME—REASONABLENESS.

It is no longer open to question that the interstate commerce commission is an expert tribunal empowered by law to determine in the first instance the reasonable or unreasonable character of the rate charged for transportation in interstate commerce.

9. SAME—RATE ASSOCIATION.

The character of the Southeastern Freight Association, the effect of its concert of action and agreements as to freight rates in the territory to which it extends, considered and discussed.

10. SAME—ADVANCE OF RATES.

When a number of railroads, acting under articles of organization, by concert of agreement and action advance the rates upon shipments of a particular class throughout all the territory to which their organization and influence with similar organizations extend, and when they actually advance such rates and exact the same of shippers, it is of no consequence that they have a stipulation in such articles that each and all members can at will and at any time withdraw from the agreement.

138 F.—48

**11. SAME—REASONABLE COMPENSATION.**
Resonable compensation for the service actually rendered is all that a common carrier is permitted to exact. Justice Brewer, for the Circuit Court of Appeals of the Eighth Circuit, in Chicago & N. W. R. R. Co. v. Osborne, 3 C. C. A. 347, 52 Fed. 914; Smyth v. Ames, 18 Sup. Ct. 418, 169 U. S. 466, 42 L. Ed. 819.

**12. SAME—UNREASONABLE INCREASE.**
Where a vast increase of lumber traffic had resulted in large increase of net revenue to the carrier, the service was inexpensive, required neither rapidity of movement nor specially equipped cars, shippers were obliged to furnish and pay for equipment, railroads were neither to load nor unload, the commodity was neither fragile nor perishable, the risk of damage was inappreciable, the industry affords a tonnage second in magnitude to only one other transported by the carrier, an arbitrary increase to points of principal destination of two cents a hundred pounds is unreasonable and unlawful. This is especially clear where the particular traffic is practically destroyed immediately after the advance is made.

**13. SAME—REGULATION OF CHARGES.**
Railroads have no legal right to graduate their charges in proportion to the prosperity which attends industries whose products they transport.

**14. SAME—INJUNCTION—REPAYMENT OF UNLAWFUL EXACTIONS.**
In this case the conclusions of the court agree with the conclusions of the interstate commerce commission. The enforcement of the advance will be enjoined, and, general counsel for respondents having stipulated in judicio they would repay to the shippers the sum total of the increased exactions in case such increase should be held illegal, a reference will be had to ascertain the amount thus due the complainants respectively, and decree will be rendered therefor.

(Syllabus by the Court.)

In Equity.

Ellis, Wimbish & Ellis, for complainants.

Ed. Baxter, for respondents.

John I. Hall, for Georgia Southern & F. Ry. Co.

Dorsey, Brewster & Howell, Dessau, Harris & Harris, C. B. Northrop, and Merrel P. Callaway, for Southern Ry. Co.

Lawton & Cunningham, for Central of Georgia Ry. Co.

Kay, Bennett & Conyers, for Atlantic Coast Line Ry. Co.

Louis F. Garrard, for Macon & Birmingham Ry. Co.

King, Spalding & Little, for Louisville & Nashville R. Co.

Brown & Randolph, for Seaboard Air Line Ry.

Claude Walker, for Nashville, C. & St. L. Ry. Co.

Mason, Hill & McGill, for Southeastern Freight Ass'n.

SPEER, District Judge. An adequate statement of the issues in this case is given in the report of the interstate commerce commission which appears in the record. The Southeastern Freight Association is a combination of common carriers. In the preamble of its organic agreement it is stated that its purposes are set forth in the "following articles." A critical scrutiny of the articles will disclose its machinery, but we fail to discover any express statement of its purpose. It is, however, plainly enough to fix and control the rates to be charged by each and all of its members for the railway transportation of freight. Most of the railways constituting its membership are actively engaged in interstate commerce, and all of them may be. The territory to which this association extends

its dominating control comprehends the states of Virginia, North Carolina, South Carolina, Georgia, Florida, and those portions of Tennessee and Alabama east of a line extending from Chattanooga via Birmingham, Selma and Montgomery to Pensacola. In that territory, with all of its varied products, with an area and population vaster than many empires of which we have an account, as regards every interest dependent upon the transportation of commodities, the action of the association is more authoritative than the firman of the Sultan or the ukase of the Czar. A most important industry of this association's dominion is the manufacture of lumber. The tonnage of this product is enormous. The cotton plant is indigenous to much of this territory, but while in the year 1903 the railroads whose rates are arranged through the Southeastern Freight Association transported 1,274,727 tons of cotton, in the same year, of lumber, they moved 9,808,463 tons, or nearly eight times as much. Indeed, in tonnage thus transported lumber was not approached by any other product, and was only exceeded by bituminous coal. This tonnage has been steadily increasing. In 1901 it had been little more than six and a half millions, and two years later, as we have seen, it was nearly ten millions of tons. The vast income from moving this tonnage, an immense proportion of which was the product of the forests and mills of Georgia, poured into the treasuries of the defendant companies. That it was remunerative is not in dispute. It is charged in the bill that it was very profitable. In the answer it is admitted that it was profitable. The remunerative rates for which this product was transported could scarcely have been denied in view of the fact that the rates themselves had been advanced pari passu with the increase of tonnage. For their convenience, the rate makers have divided their territory into what are termed "groups." From group 2 of the Southern Railway there has been an increase of 3 cents a hundred pounds on lumber since May, 1894, 2 cents since September, 1899. From May, 1894, to September, 1899, the rate to Cairo from that group was 13 cents. This was increased to 14 cents from September, 1899, to June, 1903. From other groups, generally speaking, since 1894, the increase has amounted to four cents a hundred pounds. From all the groups the present rates to Cincinnati, Louisville, and Evansville are greater than they have been since 1891. The rate to Cincinnati from most of the groups is now four cents higher than it was in 1892, and from the Georgia group on the Southern Railway, to Cincinnati, Louisville, and Evansville and all Ohio river points, the rates are three cents higher than they have been since 1891. This steady and marked increase of rates for the transportation of this freight, coincident with the phenomenal increase of the tonnage carried, seems abnormal. "The general rule," said the interstate commerce commission in its valuable report in this case, "is this: The greater the tonnage of an article transported, the lower should be the rate. No rule is more firmly grounded in reason or more universally recognized by carriers." While these conditions were existing, while the respondent railroads were engaged in the transportation of the largest annual ton-

nage of lumber theretofore known, in April, 1903, the Southeastern Freight Association and other similar associations having conferred upon the subject, the defendant companies, acting in concert, announced that they would forthwith put into effect an increase of two cents a hundred pounds in the rate on lumber to points on the Ohio river and beyond. This announcement brought the intelligence of this additional levy upon their products to the owners of every mill in Georgia, in Florida, in Alabama, in Mississippi, in Louisiana, and in Arkansas. On the lumbermen at work in the immediate domain of the Southeastern Freight Association estimated on the tonnage of that year the assessment amounted to $132,000. It is perhaps not surprising that these men immediately sought protection through the courts.

On the 17th of April, 1903, the original bill was filed. The complainants are H. H. Tift, W. S. West, J. Lee Ensign, J. S. Betts & Co., Garbutt Lumber Company, Alapaha Lumber Company, Southern Pine Company, and all other members of the Georgia Sawmill Association (a voluntary association, not a party). The averments, in brief, are that the defendant companies had published, and were to immediately put into effect, an increase of two cents a hundred pounds in the rate on lumber from Georgia points to points of delivery on the Ohio river and beyond; that the threatened advance was unjust and excessive, and would result in irreparable injury. An injunction was sought upon the ground that the contemplated action of defendants was in violation of the act of Congress to regulate commerce. A temporary restraining order was issued, with the usual rule calling upon the respondents to show cause why the injunction sought by the bill should not be granted. A general demurrer denying the jurisdiction of the Circuit Court of the United States as such, and as a court of equity, was interposed. Respondents also filed a response to the rule. A hearing was had upon the demurrer, and also upon the evidence submitted by both parties. By interlocutory decree entered on the 16th day of May, 1903, it was held that the court had jurisdiction to grant the relief sought, if finally satisfied of the righteousness of complainants' demand; that the demurrer be overruled; that the bill, with amendments, be retained in the files of the court; and that the temporary injunction be dissolved. The reasons which moved the court to take this action were stated in the opinion that day filed. Among them was the statement that the increase of rates had not been actually imposed. The decree concluded with the following clause :

"In case the respondents shall enforce the rates complained of and the complainants shall make proper application to the interstate commerce commission to redress their alleged grievances, the court will entertain a renewed application on the record as made, and such appropriate additions thereto as may be proposed by either party for enjoining the enforcement of such rates pending the investigation by the commission, unless otherwise dissolved, and on presentation to the court of the report of the commission such other action be taken as will be conformable to law and the principles of equity."

Upon the dissolution of the restraining order, to wit, on the 22d of June, 1903, the respondents at once made the advanced rates effective. On the day following the complainants presented to the

interstate commerce commission their complaint and their prayer that the advance be declared to be excessive, unjust, and unreasonable. Subsequently complainants again sought from this court an injunction to restrain the enforcement of the rates pending the action of the commission. Upon this application a full rehearing of the controversy was had. This involved an exhaustive discussion of the jurisdictional questions and the facts as well. The conclusions of the court may be found in 123 Fed. 789–796. Action upon the application of complainants was withheld. The reasons for this course, as stated on page 796 of the opinion, are as follows:

"The complainants, it appears, have appealed to the commission. * * * The respondents are all solvent—probably all of them highly prosperous—railway corporations. It will be easily competent for the complainants to keep careful account of all the charges claimed to be unreasonable and excessive exacted by the defendants on shipments of lumber to the territory described in the bill. If their contention shall be maintained, it will be competent for the court in its final decree to direct the respondents, or either of them, to make restitution of the sums thus exacted. Indeed, the learned special counsel for the respondents, by his statement made in judicio, binds his clients to promptly repay to the complainants all such sums in case they shall finally prevail. Nor is it likely that in the interval which shall remain before the commission will act there will ensue any serious impairment of the business of complainants, or either of them. It is easily conceivable that a case or cases of this general character might be presented on which it would seem obligatory on the court to grant an immediate injunction. Such injunctions, however, should not be granted save in cases of grave and compelling exigency. Judicial action should be conservative, and rarely is such conservatism more plainly required than when vast commercial operations involved in interstate transportation will be arrested or disturbed by incautious orders. In this case the duty to grant the extraordinary order sought does not now seem imperative. The court, therefore, in view of the record and of the considerations mentioned, will withhold further judicial action upon the application until properly apprised of the action of the interstate commerce commission. When we shall have received the valuable assistance in the performance of the grave duty before us which must be expected from the conclusions of that authoritative and eminent body, such other and further action will be taken on this application as the law and the principles of equity will seem to direct."

It will thus be seen that the court did not deny the injunction prayed for. It merely withheld action to await the report of the commission. This has now been submitted. After hearing and considering the voluminous evidence, that body, on February 7, 1905, made its report. The report sustains in toto the contentions of the complainants, and declares that the advance in rates complained of was unreasonable, unjust, and violative of the act to regulate commerce. The report was, however, not unanimous. The honorable chairman, Mr. Knapp, and Commissioner Fifer expressed their dissent as follows:

"In the view we take of this case, the conclusions of our associates are not justified by the facts and circumstances appearing in the record, or otherwise entitled to consideration. Holding that the rates complained of have not been shown to be in violation of law, we respectfully dissent from the foregoing report and opinion."

It is regrettable that the dissenting commissioners did not more fully record the grounds of their dissent. It might then be possible for the court to inquire to what extent the dissent was supported by

"facts and circumstances appearing in the record," or by facts and circumstances not so appearing, and which, therefore, do not appear to the court. The order of the commission seeking to make effective their conclusions declares the rates and charges complained of to be excessive, unreasonable, unjust, and in violation of the provisions of the act to regulate commerce. "It is further ordered that the defendants, the Southern Railway Company, Atlantic Coast Line Railway Company, Louisville & Nashville Railroad Company, Nashville, Chattanooga & St. Louis Railroad Company, Seaboard Air Line Railway, Central of Georgia Railway Company, Georgia Southern & Florida Railway Company, and the Macon & Birmingham Railway Company, be, and each of them is hereby, notified and required to cease and desist on or before the 1st day of April, 1905, from further maintaining or enforcing said unlawful advance of two cents per one hundred pounds, and the said unlawful rates and charges resulting therefrom, for the transportation of lumber as aforesaid."

A certified copy of the opinion and order of the commission has been duly filed. This is accompanied by an application for an injunction pendente lite and for final decree granting the relief prayed in the original bill. Counsel for the respective parties, with meritorious purpose to avoid delay and to obtain a speedy hearing on the merits, entered into a stipulation that the evidence taken before the interstate commerce commission shall stand as the evidence in this court, subject, however, to the right of either party to apply to the court for leave to introduce such additional evidence as the court may think proper for a just decision of the case. On the hearing additional evidence, mainly in the form of affidavits, was submitted by the respective parties. It is agreed that the testimony thus submitted shall have the same force and effect as if it had been regularly taken in accordance with the rules in equity. With equally meritorious purpose counsel for the respective parties agreed that this should stand for and be the hearing for final decree in equity. Counsel for the respective parties have been fully heard. The hearing was concluded on the 22d inst. On account of the gravity of the questions involved and the tremendous record, we have taken time for consideration.

The effect of the commission's report was strongly controverted in the argument. Counsel for the complainants insisted that it must be accepted by the court as true, unless it was wholly without evidence to support it. On the other hand, it was insisted that it was only prima facie correct, and "tipped the judicial scale only by a hair's breadth." Our view is that it would be violative of explicit law, the settled policy of government, and the most practical principles of reason and justice for the courts of the nation, save for controlling reasons of law or fact, to discredit or disparage the conclusions of the interstate commerce commission. The act to regulate commerce (paragraph 14), declares that the "findings of fact set forth in the report of the commission shall in all judicial proceedings be deemed prima facie evidence as to each and every fact found." In paragraph 16 this provision is distinctly reiterated.

Nor are we in any doubt as to the import of the expression "prima facie evidence." In Kelly v. Jackson, 6 Pet. 631, 8 L. Ed. 523, Mr. Justice Story declares that "prima facie evidence of a fact is such as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for the purpose." The authority of this case has been uniformly recognized. Rose's Notes on U. S. Reports, vol. 3, p. 301. It follows that the report of the commission declaring these advanced rates to be excessive and violative of the act to regulate commerce has such evidential effect that, had complainants been content to introduce the report and to rest their case without further evidence, it would have entitled them to the decree unless the respondents by preponderant and controlling evidence should rebut and disprove its findings. Lilienthal's Tobacco v. United States, 97 U. S. 268, 24 L. Ed. 901. In other words, the act of Congress creates a rule of presumption in favor of the commission's report, which, on its introduction, changes the burden of proof, as in this case, from the complainants to the respondents. "There is not the least doubt, on principle," says the author of the recent work Wigmore on Evidence, "that the Legislature has entire control over such rules, as it has over all other rules of procedure in general, and evidence in particular, subject only to the limitations of evidence expressly enshrined in the Constitution." 2 Wigmore on Evidence, par. 1354, cl. 3. Elsewhere in the same comprehensive and valuable work, vol. 1, par. 7, it is stated: "Apart from the constitutional rules to protect against statutory changes the Legislature has the power to alter or create any rule of evidence."

The wisdom of according to the report of the commission this important effect is as little open to question. The administration of justice, said Webster, "is the chiefest concern of man upon earth." Within the scope of that function of government there is, perhaps, no single topic of greater magnitude or moment than controversies which arise in trade and commerce. Said Sir Walter Raleigh, "Whosoever commands the trade of the world commands the riches of the world, and consequently the world itself." In a material sense, and in our astonishing civilization, nothing is more important than the transportation of commodities sold or interchanged, and in transportation the stability and reasonable character of the rates charged therefor is scarcely less important than transportation itself. The three grand departments of government, legislative, executive, and judicial, are with steady and swerveless purpose enacting or enforcing laws to safeguard the rights of the general public, and as well that portion engaged in the business of transportation. The shippers are appealing to government to protect them against unwarrantable exactions by the carriers. Appeal may be made by the carriers to protect their interests from unremunerative rates to which they may be restricted by state or other local authorities. In either case complaint is heard and redress is given. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Chicago, etc., Ry. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Rose's Notes on U. S. Re-

ports, vol. 11, p. 946 et seq. It is no longer doubtful that "the question of the reasonableness of a rate of charge for transportation is eminently a question for judicial investigation." Justice Blatchford, in Chicago & St. Paul Ry. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970. To this end, in part, the government has created the interstate commerce commission. It is a tribunal to hear, investigate, and report on the reasonableness of rates, and to attempt the correction of inequalities and injustice therein. Said the Supreme Court in Louisville & Nashville R. R. Co. v. Behlmer, 175 U. S. 675, 20 Sup. Ct. 219, 44 L. Ed. 309, "That body, in the nature of its organization and the duties imposed upon it by the statute, is peculiarly competent to pass upon the questions of fact of the character here arising." In view of these considerations and precedents, it can, we think, be no longer open to question that the interstate commerce commission is the expert tribunal empowered by law to determine, in the first instance, the reasonable or unreasonable character of the rates charged for transportation in interstate commerce. Said Judge Taft, for the Circuit Court of Appeals, in East Tennessee, V. & G. R. R. Co. v. Interstate Commerce Commission, 99 Fed. 64, 39 C. C. A. 425:

"It has been suggested that the traffic managers are much better able by reason of their knowledge and experience to fix rates and to decide what discriminations are justified by the circumstances than the courts. This cannot be conceded so far as it relates to the interstate commerce commission, which, by reason of the experience of its members in this kind of controversy, and their great opportunity for full information, is in a sense an expert tribunal."

We may repeat what was stated by this court in Commission v. Louisville & Nashville R. R. Co., 118 Fed. 626:

"The righteous orders of the great commission which has been primarily intrusted by Congress with the tremendous duty should in all proper cases be respected and enforced by the courts of the country. While, on occasion, the railway or other corporation may suffer a temporary diminution of revenues from an order of this character, the interest of the public, and in the end the interest of the corporation itself, is conserved. In all such cases the general welfare must control. 'Salus populi est suprema lex.'"

It is proper to observe, however, that the court has considered the entire record, and has formed its conclusions not only from the report of the commission, but from all the evidence submitted to that body and stipulated into the case here, and from the additional evidence submitted de novo on this hearing.

A highly significant feature of this case is the fact that the rates complained of are the result of concert of action on the part of the members of the Southeastern Freight Association. This organization, as we have seen, embraces as members all of the defendants except the Nashville, Chattanooga & St. Louis Railroad and the Louisville & Nashville Railroad Company. But the latter, as colessee of the Georgia Railroad, while not nominally, is also essentially, a member. The association was a proper, though perhaps not a necessary, party. It might well desire to be heard with regard to the relating charges against its character and conduct. While in the original bill there was a prayer that this association should be declared an illegal combination in restraint of interstate trade,

and that the defendant railway companies be enjoined from prosecuting the purposes of such illegal combination through the medium of the freight association, counsel for the complainants in argument properly abandon that prayer. While this is true, it is also true that the methods of the association, and the conduct of its members in this particular case, were placed before the commission, and are fully before the court. In reply to the contention on the part of the respondents that they acted independently each for itself, and not through the agency of the Southeastern Freight Association, the commission finds:

"The proof shows conclusively that the advance was the outcome of concert of action and previous understanding between the companies. Through their authorized official representatives, they conferred with each other repeatedly as to the making of the advance; recognized the fact that, because of competition in common markets between the lumber producing districts served by them, the advance should be from all those districts or none; and, finally, they all promulgated the advance to take effect at exactly the same date and for exactly the same amount. This concurrence of action was not only between the railway companies, parties defendant in this case, and in relation to rates from Georgia shipping points, but was participated in by the lumber-hauling roads serving the territories both west and east of the Mississippi in Arkansas, Louisiana, Mississippi, Alabama, and Florida."

The commission concludes that it is its duty to consider this joint, or concert of, action of the defendants as bearing upon the reasonableness and validity of the advanced rate which results. It holds that the element of competition is eliminated. In the absence of legitimate competition, destroyed, as we shall presently see, by methods obviously illegal, the commission presumes that the advance rates are higher than legitimate competition would produce. In other words, the marked increase of charges for transportation of that commodity which, save one other, affords the largest tonnage of freight to the respondent roads, did not originate from a normal or reasonable exigency of the respondents' business. On the contrary, it was an arbitrary exaction, imposed by a combination of railroad agents made in restraint of the natural movement of the product in the lumber trade. This combination or concert of action on the part of the respondent railroads is plainly violative of that provision of the interstate commerce law which forbids pooling. This was enacted, among other things, for the purpose of securing competition. Pooling may be as well effected by a concert in fixing in advance the rates which in the aggregate would accumulate the earnings of naturally competing lines, as by depositing all of such earnings to a common account and distributing them afterwards. That such an association and concert of action between agents of naturally competing lines is destructive of competition is equally unanswerable. To entertain any other view is to ignore reiterated decisions of the Supreme Court of the United States and many rulings of the Circuit Courts and of the state courts. Perhaps the leading cases on this subject are United States v. Freight Association, 166 U. S. 341, 17 Sup. Ct. 540, 41 L. Ed. 1007; Joint Traffic Association Case, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. In the first case the court had under considera-

tion the legality of the Trans-Missouri Freight Association. The agreement of that body may differ in form, but its substantial pur-pose was the same as that of the Southeastern Freight Association. It avowedly was the "mutual protection to the railroads by estab-lishing and maintaining reasonable rates, rules, and regulations on all freight traffic, both through and local." After argument by many of the most eminent counsel in the country, and after exhaus-tive consideration, the court held that the anti-trust law prohibiting contracts, combinations, and conspiracies in restraint of trade or commerce among the several states or with foreign countries apply to and cover common carriers by railroad, and a contract between them in restraint of such trade or commerce is prohibited even though the contract is entered into between competing railroads only for the purpose of thereby effecting traffic rates for the trans-portation of persons and property. It was further held that, in or-der to maintain such a contention the complainant is not obliged to show that the agreement in question was entered into for the pur-pose of restraining trade or commerce if such restraint is the nec-essary effect, and concluded that the anti-trust act applies to rail-roads, and that it renders illegal all agreements which are in re-straint of trade or commerce. The court then proceeds to declare that the agreement of the association does in fact constitute such a restraint in violation of the law. It is proper to state that four judges, three of whom are not now on the bench of the court, dis-sented from this conclusion; but the opinion of the majority is, of course, controlling. In the subsequent case of United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, the court, after full consideration, reaffirmed its holding in the Trans-Missouri Case. It further declares that Congress, with re-gard to interstate commerce, and in the course of regulating it in the case of railway corporations, has power to say that no contract or combination shall be legal which shall restrain trade and com-merce by shutting out the operation of the general law of compe-tition. The tremendous significance of these findings is shown by the multitude of cases in which the doctrines announced have been utilized and reaffirmed. See Rose's Notes on U. S. Reports, vol. 12, p. 958 et seq.; also supplement to same publication, vol. 3, p. 795. Perhaps the most noted case on this subject is that of the Northern Securities Company v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679. There it was held that a contract by which a majority of stock of two companies who owned parallel in-terstate railroads is transferred to a corporation organized for the purpose of holding and voting the same and receiving dividends and dividing the same pro rata among the stockholders of the two com-panies, violates the anti-trust law. Such is the superabundance of authority upon this subject that further citation will be superfluous. It may be pardonable to recall that one of the pioneer cases on this important topic was that of Rowena Clarke v. Central R. R. & Banking Company of Georgia (C. C.) 50 Fed. 338, 15 L. R. A. 683 et seq., heard in this district. This case was decided in 1892. Com-menting upon similar conditions, it was there observed:

"It is not difficult to perceive that a combination of corporations which produces a condition so inequitable cannot be sanctioned by the law. We believe that transactions of this character are within the spirit, if not within the letter, of the act of Congress known as the 'Sherman Anti-Trust Law' (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). It is certainly, as we have seen, obnoxious to the law of Georgia, and it was certainly as obnoxious to the common law."

This decision was made 13 years ago. The principles then announced, which were challenged in many influential quarters, are now imbedded in the country's jurisprudence and in the legislation of the national Congress. It was insisted with great earnestness by the learned special counsel for the respondents that because the various members of the association expressly stipulated in the articles of organization that each and all members could at will and at any time withdraw from the agreement to fix rates, it was not a combination in restraint of trade. This view seems wholly untenable. That is merely a recitation of a privilege which any party to an unlawful enterprise inherently enjoys. Confederates or conspirators who unite to do an unlawful act or to do a lawful act in an unlawful way may jointly or severally abandon the project. The law affords them the locus pœnitentiæ. If, however, the object of the conspiracy is accomplished, its character is not to be determined in view of the consideration that the conspirators might have repented, but with an eye single to the fact that they did not repent. Besides, it is indisputable that the agreements of the association were made to be kept, and not to be broken. Good faith between the members, not to mention a powerful compulsory force behind them, obliged that the agreements be kept, and the fact is, as the commission finds, they were kept.

The cardinal error to which the railroads have been committed in this important controversy is the apparent belief that they have the right, by arbitrarily increasing freight rates, to divert at any time to their own treasuries a share of the profits of successful industries or occupations. It was not contended that the antecedent rates were unremunerative. As before stated, they were conceded to be profitable. That additional revenue was needed to meet increased expenses was the motive of the advance was testified by Vice President Culp of the Southern Railway Company. To quote his language: They "looked about to see where" they could best, but without injury, get that additional revenue, and one of the commodities which they thought would "bear an advance" was lumber. But the courts have more than once decisively corrected this assumption on the part of railway officials. It is true that the business of railway transportation is usually carried on by private capital invested in corporations. It is, however, business of a quasi public nature. As we have seen, there is no doubt that within the limitations of the Constitution it is subject to governmental control. These facts prohibit the agents of the railway from charging, like the owners of other property, any price they may choose to exact for the use of the railroad. The law does not fail to regard the enormous franchises which have been granted to the railroads by the public, their corporate powers, the right to avail themselves of

the right of eminent domain, the right to protection against exorbitant restrictions or exactions from local authority, and other similar considerations. These views are very plainly set forth in the opinion of Justice Brewer sitting with the Circuit Court of Appeals of the Eighth Circuit in the case of Chicago & N. W. R. R. Co. v. Osborne, 52 Fed. 914, 3 C. C. A. 347. The conclusion of the learned justice is that reasonable compensation for the service actually rendered is all that the railroad is permitted to exact. Five years after the decision just cited was made the Supreme Court of the United States had before it the same question. This was in the case of Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. This was a case of great importance. The opinion was happily unanimous. It was argued for the appellant by Mr. John L. Webster and by Mr. Churchill, Attorney General of the state of Nebraska, and with them appears the famous name of William J. Bryan. For the appellees there appeared J. M. Woolworth and that renowned leader of the American bar, the late Mr. James C. Carter. The case would be additional authority for the jurisdiction of this court in equity to prevent a multiplicity of suits, if such additional authority was needed; but the great duty which fell upon the court was to determine the rule for fixing the reasonableness or unreasonableness of transportation rates. The state of Nebraska had attempted to determine this by fixing an arbitrary maximum for the transportation of interstate commerce. This the court held it could not do. But in holding this it announced certain principles which the controlling officers of railroads, charged as they are with such vital duties to the commerce and welfare of the country, might well take to heart. "The railroad," said the court, "is a public highway, none the less so because constructed and maintained through the agency of a corporation deriving its existence and powers from the state. Such corporation was created for public purposes. It performs a function of the state. Its authority to exercise the right of eminent domain and to charge tolls was given primarily for the benefit of the public. It is under governmental control, though such control must be exercised with due regard to the guaranties for the protection of its property." It may not "fix its rates with a view solely to its own interests, and ignore the rights of the public. But the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public, or the fair value of the service rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders."

After careful consideration of the extensive record, there seems to have been an utter absence of excuse or justification for the concerted action of the railroads which advanced the rates on lumber throughout the South. The vast increase of the lumber traffic had resulted in large increase of net revenue for those roads. The service was inexpensive. It required neither rapidity of movement nor specially equipped cars, and such simple equipment as was needed the shippers were obliged to furnish and pay for. The railroads

were required neither to load nor unload the cars. This was done by the consignor and consignee. The lumber carried was neither fragile nor perishable, and the risk therefore from loss or damage was inappreciable. Mr. Tift, the principal witness for the complainants, and one of the largest lumber men of the state, testified that for 30 years he had not been compelled to present a claim for damage on lumber shipped from his mill. Nor were there any exigencies in the financial condition of the principal defendants which called for so vast a contribution to their treasuries from an industry whose product forms such a large part of their tonnage, and which is so indispensable to the public welfare. On this subject we may, perhaps, with propriety quote literally the figures and findings of the commission. On page 573 of the report it is said:

"The financial condition of the principal defendants appears to have steadily improved for a number of years up to and including the year 1903, in which the advance in rates complained of was made. They were comparatively prosperous at the date of and for years prior to the advance.

"The Southern Railway Company has declared dividends for each year from 1897 to 1903, both inclusive, ranging from $543,000 * * * in 1897, up to $4,500,000 (7½ per cent. on $60,000,000 of preferred stock) in 1903. That road also reports surpluses of from $464,013 in 1898 to $2,100,897 in 1902.

"The Louisville & Nashville Railroad Company has declared dividends for each year from 1899 to 1903, both inclusive, ranging from $1,848,000 (about 3½ per cent. on $54,912,520 of common stock) in 1899, up to $3,000,000 (5 per cent. on $60,000,000 of common stock) in 1903. That road also reports surpluses of from $40,204 in 1899 to $2,987,195 in 1903.

"The Atlantic Coast Line Railroad Company has declared dividends for each year (except year 1900) from 1894 to 1903, both inclusive, ranging from $318,399 in 1894 (5½ per cent. on $7,021,950 of common stock), up to $1,714,075 (5 per cent. on $1,744,100 of preferred stock and 5 per cent. on $36,650,000 of common stock) in 1903. The surpluses reported by that road are from $86,875 in 1894 to $1,293,983 in 1903. In 1900 no dividend was declared, but there was a surplus reported of $2,152,406.

"The Nashville, Chattanooga & St. Louis Railway Company declared dividends ranging from $100,000 in 1899 (being 1 per cent. on $10,000,000 of common stock) to $400,000 in 1895, 1896, 1897, and 1898, being 4 per cent. on $10,000,000 of common stock. For each year from 1900 to 1903 that road reported surpluses ranging from $566,907 in 1900 to $823,480 in 1903.

"The Georgia Southern & Florida Railway Company declared dividends for each year from 1897 to 1903 ranging from $27,360 (being 4 per cent. on $684,000 of preferred stock) in 1897 up to $99,240 in 1901 (being 5 per cent. on $684,000 of preferred stock and 6 per cent. on $1,084,000 of preferred stock) in 1903. For each of the years 1902 and 1903 it declared a dividend of $77,560. The surpluses reported from 1896 to 1903 range from $9,657 to $107,060 in 1896. The surplus for 1901 was $24,105, for 1902 $41,448, and for 1903 $77,968.

"The Seaboard Air Line Railway Company has declared no dividends, but reports surplus of $252,676 for 1901, $769,331 for 1902, and $754,431 for 1903. The Central of Georgia Railway Company declared no dividends, but reports surpluses for each of the years 1899 to 1903, both inclusive, ranging from $58,888 in 1899 to $203,506 in 1903. The Macon & Birmingham Railway Company has declared no dividends, and reports a deficit for each of the years from 1894 to 1903, both inclusive, ranging from $29,099 in 1902 to $96,715 in 1894. The deficit reported for 1901 was $34,313, for 1902 $29,099, and for 1903 $45,949."

It is true, as insisted, that the operating expenses of the railroads have grown larger, and the percentage of operating expenses to gross earnings has increased. But it is also true that both gross

and net earnings have steadily increased. The statement made in argument that the gross earnings of the Southern Railway have increased from $25,353,686 in 1899 to $42,313,248 in 1903 does not seem to have been challenged. In the same year the net earnings, it seems, had increased from more than eight millions to more than twelve and a half millions, and the net earnings per mile have increased more than one thousand dollars. While these figures are most encouraging, and will afford gratification to all of those who are broad-minded enough to rejoice in the prosperity of the railroads, which do so much for the welfare of the country and the advancement of its civilization, it is also true that this is probably an understatement of the real earnings of this great corporation. It was insisted by Mr. Baxter in his very able argument for the respondents that every expenditure of a railway, no matter how permanent the improvement, must be charged to the expense account of operation. This accomplished lawyer is accustomed to speak authoritatively with regard to matters intrusted to his care. His statement in judicio may be regarded as binding upon all of the respondent companies, and, if accepted, when we consider the vast material improvements which have been made in the southern railways it will be difficult to estimate the marvelous prosperity which they now enjoy. It is true counsel for the railroads insist that their net revenue did not increase in proportion to their gross earnings, but, in the nature of things, this is not to be expected in any business. A manufacturing enterprise of extensive character may make 10 per cent. by the product of its mill. It may double its capacity and double its output, but it may look in vain for a double increase in net earnings. How needless, then, was the exaction upon the great lumber industry of the South, which has occasioned this costly litigation with all of its lamentable consequences. The hardship upon the complainants was incontestable. The findings of the commission show that under the old rates they had built up a prosperous trade in the Northwest. Under the new rates this practically ceased. When the court, with what was thought to be caution conservative of the rights of all parties, retained the bill, but declined to continue the injunction, and gave complainants the opportunity to avail themselves of their right to appeal to the commission, this business was practically prostrate. Unhappily, but no doubt necessarily, there was a delay of 19 months before the commission made its finding. In the meantime, for well-known causes of a political nature, there had been a great and enthusiastic revival in the business, enterprise, and confidence of the country. A great demand for yellow pine lumber had grown up in all sections. Builders felt themselves obliged to have it, whatever the price, and whatever the rate, and large shipments were made on the advance rates. This is plainly enough shown by the numerous supplemental affidavits offered by the complainants and received as evidence. This, however, was in no sense ascribable to the action of the Southeastern Freight Association in imposing this rate, but was despite that action. It in no sense relates to the reasonableness or unreasonableness of the rate. And it should not be

forgotten that while the business of the lumbermen was recuperating the treasuries of the railroads were all the while receiving a proportionate increment from the unreasonable increase of rates which they had imposed. They have no right to graduate their charges in proportion to the prosperity which comes to industries whose products they transport. With equal reason they might demand an increase of rates for the transportation of cotton with every increase in the value of our great staple. Indeed, to concede the principle for the fixation of rates upon which the railroads through the medium of the Southeastern Freight Association have acted in this case would concede their power to levy for no better service augmentation of tolls for every increase of profit in every line of endeavor won by the enterprise, sagacity, and industry of the American people. It is superfluous to add that a government of laws, and not of men, will never tolerate such domination and control of the trade, manufactures, and commerce of the people. These views relate exclusively to the facts before the court in this case as proven incontestably by the evidence and as found by the interstate commerce commission. Here is no attempt to discredit the incalculable services which are hourly rendered the country by the railways. In nothing do we share the animus or purposes of that sinister, selfish, and insincere agitation which would excite, if it could, the masses of the people to hatred and injustice toward corporations. Such a propaganda provokes in the justly balanced mind, and particularly in the mind trained for the administration of law, and for the protection of property and personal rights, disapprobation, and, indeed, abhorrence. With sincere enthusiasm the judge of this court has elsewhere testified to the wonderful material blessings bestowed upon our once prostrate Southland by our great railway systems in "economies of operation, in constant, if gradual, reduction of rates, in increased facilities and more expensive accommodations, in more uniform service for longer distances without change of cars, in abolition of short disjointed lines under different management, in augmentation of shipping facilities, in physical perfection of the properties and consequent safety to the public, in the steady increase in value of all the securities of these great highways of Southern commerce. * * * And with what result? Where formerly asthmatic engines attached to unsafe and noisome trains through the solitudes of an impoverished country like a wounded snake dragged their slow length along, now we behold on massive rails of gleaming steel, on roadbeds of granitic ballast, successive sections of long freight trains sturdily steaming through a prosperous land, smiling with luxuriant crops, beautiful with neat and happy homes, the chimneys of great factories giving employment to thousands, almost marking the miles; or the admiration kindles and the pulse leaps as the limited express laden with its human freight glances by on its mission of progress and civilization." In nothing do we abate that enthusiastic approval of the services of the railways to the people; but not more than any other human agency is railroad management infallible. The patriotic and proper solution of every controversy involving the vast ques-

tions of transportation is simply the trial of each case on its particular facts, and with an eye single to the merits of the one party or the other. In interstate commerce this is exclusively a duty of the national tribunals, and the laws regulating such commerce are within the exclusive power of Congress.

Innumerable are the cases in which the railroads themselves successfully invoke the identical principles here announced for their own protection against intemperate and injurious local legislation restrictive of their just powers and destructive of the just rights of their stockholders. Such was the case of Smyth v. Ames, supra. Such was the case of Chicago, etc., Ry. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970. See, also, Central R. R. v. Macon (C. C.) 110 Fed. 871; Iron Mountain R. R. v. Memphis, 96 Fed. 122, 37 C. C. A. 410; Milwaukee, etc., Co. v. Milwaukee (C. C.) 87 Fed. 577; Ball v. Rutland (C. C.) 93 Fed. 516; Cleveland City Ry. v. Cleveland (C. C.) 94 Fed. 409; Chicago, M. & St. P. Ry. v. Tompkins, 176 U. S. 173, 20 Sup. Ct. 336, 44 L. Ed. 417; Louisville, etc., v. McChord (C. C.) 103 Fed. 220. In all of these cases and many others of pertinent character which might be cited, corporations found themselves obliged to resort to the courts to obtain protection against rates which were unreasonably low. The courts of the country will be found prompt to protect them in the righteous exercise of righteous powers. They will be equally prompt in proper cases to protect the public or any individual from unrighteous exactions, particularly when invoked through the agency of unlawful combinations or associations in restraint of trade and commerce, affecting not only the welfare and happiness of the individual, but the thrift and prosperity of entire communities and great commonwealths.

In this case the conclusions of the court as to the issues involved agree with the conclusions of the interstate commerce commission as expressed by their report. A decree enjoining all the respondents against further enforcement of the rates complained of will be at once entered. Order will be taken referring to the standing master the pleadings and evidence, with instruction to ascertain the sum total of the increased rate paid by each of the complainants to either or all of the defendant companies since the rate went into effect and to the end of this litigation, and report such amount to the court, in order that, pursuant to the stipulation made by the respondents in open court, in case the complainants prevail, decree of restitution shall be made. Because of the vast extent of the lumbermen's business, and the great expense and inconvenience which might result to them, to the lumber trade, and the railways from the instantaneous enforcement of this injunction, when respondents may have purpose to appeal from this action, it will be ordered further that the decree now granted shall not take effect until 10 days from this date have elapsed, in order that the respondents or either of them, if they so desire, may seek supersedeas.